661 A.2d 231

ROBIN FIELDER, PLAINTIFF–RESPONDENT, v. NOELLE E. STO-
NACK, DEFENDANT–RESPONDENT, AND FREDERICK S.
JENKINS, TOWNSHIP OF NEPTUNE POLICE DEPARTMENT
AND TOWNSHIP OF NEPTUNE, DEFENDANTS–APPEL-
LANTS, AND KEVIN MCGHEE AND BENNIE T. MCGHEE,
DEFENDANTS.

Argued March 27, 1995—Decided July 6, 1995.

102

*Martin J. McGreevy* argued the cause for appellants (*Carton, Witt, Arvanitis & Bariscillo,* attorneys; *Mr. McGreevy* and *James D. Carton, IV,* on the briefs).

*William B. Gallagher, Jr.,* argued the cause for respondent Robin Fielder (*Klitzman & Gallagher,* attorneys; *Austin M. Kenny,* on the brief).

*Michael F. Carnevale, II,* argued the cause for respondent Noelle E. Stonack.

*Boris Moczula,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*Deborah T. Poritz,* Attorney General, attorney).

The opinion of the Court was delivered by

WILENTZ, C.J.

In *Tice v. Cramer,* 133 *N.J.* 347, 627 *A.*2d 1090 (1993), we decided that the Tort Claims Act provides immunity to police officers whose negligence in pursuing a fleeing automobile causes it to injure third parties. We based our conclusion on the history of the Act, its New Jersey common-law antecedents, its California precedents, and the legislative intent not to impede such pursuit by the threat of civil liability if accidents occur. In this case, the material facts are essentially the same except for the coincidence that the officer's negligence led to a collision in which his car, rather than the escaping person's car, collided with the third party's vehicle. The Appellate Division held that *Tice* immunity did not apply; that the result depended on which car hit the third party's car; that despite similar exigencies of the pursuit and the extent of the officer's negligence, if the fleeing car hit a third party because of that negligence, the officer was immune, but if his car hit it, he was liable. We reverse on that issue. The officer is immune in both cases.

## I

On July 27, 1989, Officer Susan Wallace of the Tinton Falls Police stopped a motorcycle for speeding. The vehicle, owned by Bennie McGhee and driven by his son Kevin McGhee, had been recorded by radar travelling at 78 miles per hour on Route 33. The driver did not have a license or registration with him but gave

the officer his name and address. When Officer Wallace returned to her patrol car to see if there was a record of the driver's license, Kevin McGhee jumped on the motorcycle and drove east on Route 33 towards Neptune Township at a high rate of speed. Officer Wallace requested assistance from the Neptune Police and proceeded to chase the McGhee motorcycle. She was promptly joined in the pursuit by two additional patrol cars.

Officer Frederick Jenkins of the Neptune Police Department was on routine patrol in the Shark River Hills section of the township when he heard the dispatcher relay the request for assistance. Although the motorcycle was not fleeing through his zone of patrol, and department policy apparently provided that officers not leave their zone unless instructed to do so by a commanding officer, Officer Jenkins proceeded to Route 33 with the intention of joining the pursuit. According to Officer Jenkins, while waiting to turn onto Route 33, he observed the motorcycle followed by two Tinton Falls patrol cars. He turned onto Route 33 and joined the pursuit behind these two patrol cars. A short time later, in the vicinity of Jersey Shore Medical Center, another Neptune patrol car joined the chase in front of him. There is some disagreement among the witnesses about the identity and number of the patrol cars ahead of Officer Jenkins. The undisputed fact, however, is that by the time the chase reached Jersey Shore Medical Center, Officer Jenkins' vehicle was either the third or fourth police car involved in the pursuit of the motorcycle.

Prior to Officer Jenkins reaching the intersection of Routes 33 and 35, Sergeant Blecki, the Neptune shift commander, radioed all Neptune mobile units participating in the pursuit and ordered that they terminate pursuit if there was a risk of danger to themselves or others. The intersection of Routes 33 and 35 is one of the most heavily traveled in Monmouth County. A signal light controls the flow of traffic. The motorcycle and the first two or three pursuing patrol cars sped through the intersection with the green light in their favor. A witness at the scene stated that these vehicles were about a minute ahead of Officer Jenkins. Jenkins himself stated

that at this point he could not see the motorcycle, but could see the rear of the last patrol car. Before Officer Jenkins entered the intersection, the light turned red. Officer Jenkins stated that he activated both siren and warning lights, slowed down and looked for cross traffic before entering the intersection. There is disagreement, however, among the parties and other witnesses about whether, and if so, when the siren was activated. Defendant Noelle Stonack was driving Southbound on Route 35 with plaintiff Robin Fielder in the front passenger seat. As the Stonack vehicle entered the intersection with the green light in her favor, her vehicle and Officer Jenkins' patrol car collided, resulting in severe injury to Fielder.

Fielder filed a complaint against Stonack, the McGhees, Officer Jenkins, the Neptune Police Department and the Township of Neptune to recover damages for her injuries. The defendants [1] filed a motion for summary judgment claiming immunity under the New Jersey Tort Claims Act, N.J.S.A. 59:1–1 to 12–3. The court granted the defendants' motion and, relying on the Appellate Division's decision in Tice v. Cramer, 254 N.J.Super. 641, 604 A.2d 183 (1992), held that they were immune from liability under the Tort Claims Act as a matter of law.

The Appellate Division granted plaintiff Fielder's motion for leave to appeal and reversed the trial court's order granting summary judgment. Fielder v. Jenkins, 263 N.J.Super. 231, 622 A.2d 906 (App.Div.1993) (Fielder I ). The court noted that it was error for the trial judge to rely on the holding of Tice since that case involved an injury which resulted from a collision between the pursued vehicle and an innocent third party. The Appellate Division in Tice had relied on two separate sections of the Tort Claims Act for its holding, N.J.S.A. 59:5–2(b) and 3–3,[2] but the

---

[1] The term defendants as used throughout this opinion refers to Officer Jenkins, the Neptune Police Department and the Township of Neptune.

[2] Section 5–2 of the Tort Claims Act provides:

Neither a public entity nor a public employee is liable for:

Appellate Division in *Fielder I* held that neither section applied to the facts before it.

The court held that *N.J.S.A.* 59:5–2(b), which immunizes a public entity as well as a public employee from liability for any injury caused by an escaping person or person resisting arrest, was not applicable to a case in which the injury is "caused by" the pursuing officer. "[I]f the pursuing police officer himself is involved in the accident, the proximate cause of the accident is, if he was driving negligently, his own conduct as a driver. To that extent he, not the person he was pursuing, caused the injury." *Fielder I*, 263 *N.J.Super.* at 235, 622 *A.2d* 906. The Appellate Division went on to reject *N.J.S.A.* 59:3–3, the second provision relied on by the *Tice* court, which provides immunity for a public employee who "acts in good faith in the execution or enforcement of any law." *N.J.S.A.* 59:3–3. "We are satisfied ... that this section does not apply to negligent operation by a police officer of his patrol car." *Fielder I*, 263 *N.J.Super.* at 236, 622 *A.2d* 906. The court further noted that *N.J.S.A.* 39:4–91, which states that drivers must yield the right of way to emergency vehicles, nonetheless requires the driver of the emergency vehicle to "drive with due regard for the safety of all persons." *Id.* at 235–36, 622 *A.2d* 906 (quoting *N.J.S.A.* 39:4–91). The Appellate Division reversed the grant of summary judgment and remanded for trial.

---

a. An injury resulting from the parole or release of a prisoner or from the terms and conditions of his parole or release or from the revocation of his parole or release.
b. any injury caused by:
(1) an escaping or escaped prisoner;
(2) an escaping or escaped person; or
(3) a person resisting arrest; or
(4) a prisoner to any other prisoner.
[*N.J.S.A.* 59:5–2.]
Section 3–3 provides:
 A public employee is not liable if he acts in good faith in the execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment.
 [*N.J.S.A.* 59:3–3.]

On July 28, 1993, four months after the Appellate Division decided *Fielder I*, this Court affirmed the Appellate Division decision in *Tice v. Cramer*, 133 *N.J.* 347, 627 *A.2d* 1090 (1993), holding "that police officers are absolutely immune under *N.J.S.A.* 59:5–2b(2) for injuries resulting from their pursuit of a person who has failed to stop at police command even though the injuries would not have occurred but for the negligence of the police." *Tice, supra,* 133 *N.J.* at 351, 627 *A.2d* 1090. The defendants filed another motion for summary judgment in the trial court on the grounds that *Tice* effectively had overruled the Appellate Division's holding in *Fielder I*. They asserted that under the holding of *Tice* a police officer had absolute immunity from liability, in the absence of willful misconduct, for injuries sustained in a collision between the officer's car and an innocent third party, and that they were therefore immune from liability as a matter of law. While acknowledging language in the *Tice* decision which questioned the conclusion in *Fielder I*, the trial court held that it did not amount to an overruling of *Fielder I* and denied the motion for summary judgment.

The Appellate Division granted interlocutory appeal and affirmed the trial court's denial of summary judgment. *Fielder v. Jenkins,* 274 *N.J.Super.* 485, 644 *A.2d* 666 (App.Div.1994) (*Fielder II*). The Appellate Division concluded that prior to the Tort Claims Act, the common law and relevant statutes recognized the same distinction that it drew in its decision below, and that the Tort Claims Act adopted it, granting immunity if collisions involved the escaping vehicle but imposing ordinary common-law liability if the officer's car was involved; that the language of *N.J.S.A.* 59:5–2b supports that conclusion; that such a conclusion accords with "our present system of socially responsible jurisprudence," a "basic tenet" of which is "by insurance coverage[ ] to spread the risk of compensating individual victims of negligence," *id.* at 491, 644 *A.2d* 666; that conferring immunity "upon *any* motorist from the consequences of his own negligent driving" is inconsistent with our "long history of legislative solicitude for the innocent motorist," *id.* at 492, 644 *A.2d* 666 (emphasis added); that

"public protection requires the imposition upon police officers of a duty of care commensurate with the circumstances" when they drive, *ibid.*; that it was "aware of no situation in which a person is not charged with liability for the consequences of his own negligent driving" and that it did "not believe the Tort Claims Act so requires when the negligent driver is a police officer," *id.* at 493, 644 *A.*2d 666; and, finally, that other jurisdictions make this same distinction. *Id.* at 493–94, 644 *A.*2d 666.

We treat these views of the Appellate Division, including the underlying theme that there is a difference between the two situations. We address the Appellate Division's rejection of the Act's "good faith" defense. Finally, we deal with that court's holding that apart from the foregoing considerations, all leading the Appellate Division to affirm the trial court's denial of the officer's motion for summary judgment, there was yet an alternative ground for such denial: that even if the officer was otherwise immune, the record on the summary judgment motion did not foreclose a finding of willful misconduct, *id.* at 495, 644 *A.*2d 666, a finding which would deny immunity under the Act. *N.J.S.A.* 59:3–14.

## II

The distinction adopted by the Appellate Division departs from our tort law concerning automobile negligence. Pursuant to that law, liability ordinarily depends on negligence and causation, not on which cars were involved in the actual collision. We have no doubt there are many cases holding drivers liable even though their car was not involved in a collision, if their negligence caused it, including some reported, *e.g., Andreassen v. Esposito,* 90 *N.J.Super.* 170, 216 *A.*2d 607 (App.Div.), *certif. denied,* 46 *N.J.* 605, 218 *A.*2d 644 (1966), as well as cases holding drivers whose cars *were* involved in the collision *not* liable if their negligence did *not* cause the collision, *e.g., Ryslik v. Krass,* 279 *N.J.Super.* 293, 652 *A.*2d 767 (App.Div.1995). The Appellate Division's construction of the Tort Claims Act, furthermore, would remove immunity

completely on those fairly frequent occasions where neither the pursued vehicle nor the police car is involved in the collision, where innocent motorists crash into each other's cars as a result of the high-speed chase and the concurrent negligence of the drivers of the pursued vehicle and the police vehicle. The "who hit whom" approach would immunize the negligent police officer if the pursued vehicle smashed into these other cars, but not if it escaped the collision that it caused. Given the necessarily assumed fact that both vehicles caused the collision, albeit "indirectly," further construction to avoid the obvious consequence of this interpretation of the statute would presumably lead to distinctions concerning which indirect cause was more "direct" than the other.

The critical factor in automobile cases is not which cars are involved in the collision, but whose negligence was the cause. This *is* an automobile negligence tort case, although liability ultimately is governed by the Tort Claims Act. We deem it unlikely that the Legislature would upset this unvarying course of tort law by making the consequences of one's negligence dependent on whether one did or did not actually hit another vehicle. As we suggested in *Tice*, the happenstance of which car hit the other vehicle is an unsound basis for exculpating or inculpating the negligent driver who caused the accident: that driver is liable whether that car is totalled or emerges without a scratch. The proposition is fundamental and elementary in negligence law, and it would require a clear indication of legislative intent to reverse it. There is no such indication, and the legislative policy considerations point strongly in the other direction. Indeed, they are a major reason for the results both in *Tice* and in this case.

The basis for our reading (and the Appellate Division's) of the statute in *Tice* was the same as the basis for the ruling in *Roll v. Timberman*, 94 *N.J.Super.* 530, 229 *A.*2d 281 (App.Div.), *certif. denied*, 50 *N.J.* 84, 232 *A.*2d 147 (1967): police officers' pursuits of escaping drivers should not be inhibited by the threat of civil liability if an accident ensues. That was our explicit conclusion concerning the legislative intent codifying that immunity in the

Tort Claims Act, *Tice, supra,* 133 *N.J.* at 363, 365, 627 *A.*2d 1090. That immunity, now firmly established in *Tice* as serving the legislative goal of effective police pursuit, must be given the scope intended by the Legislature. The Legislature not only recognized that the threat of civil liability could impede police officers engaged in pursuits, but could also hinder a municipality's efforts to effectively train their police officers to vigorously enforce the law. Although in *Tice* this Court regarded, and now regards, proper training and standards as paramount, it recognized the problems associated with training developed under the threat of civil liability. "[T]he potential of tort liability might encourage standards and training so restrictive—for the purpose of avoiding injuries and liability—as to impede the ultimate goal of vigorous law enforcement, including the vigorous pursuit of suspects." *Id.* at 365, 627 *A.*2d 1090.

That conferring immunity has a price is obvious: aggressive pursuit will lead to accidents; cautious pursuit will cause fewer. We accept the Legislature's policy decision, as we must. It is clearly a matter within legislative power. The Appellate Division's decision below, both its outcome and reasoning, appears to favor police liability in opposition to immunity in police pursuits. Whatever the wisdom of such policy, it is not the one adopted by the Legislature.

■■ The Appellate Division justifies its decision by its accord with statutory legislative policies favoring compensation of injured victims through insurance, *Fielder II,* 274 *N.J.Super.* at 491–92, 644 *A.*2d 666, an observation accurate enough, but one that we believe is not in accord with the Tort Claims Act and its general purpose, as well as the specific purpose of section 2b(2). The Act is not an insurance plan; it was not designed to assure compensation but to restore sovereign immunity. The section of the statute at issue is similarly not part of an insurance plan but is specifically designed, as we held in *Tice,* to confer immunity on police officers. The Appellate Division's extensive discussion of the common-law liability of police officers and the limits, prior to the Act, of the

statutory protection afforded by *N.J.S.A.* 39:4–91 to those driving "emergency vehicles" seems similarly inappropriate. It notes that police officers were liable, before the Act, for their negligence despite such an "emergency vehicle" statute, but that statute does not apply in this case.[3] As we held in *Tice,* and as the Appellate Division held in both *Roll* and *Tice,* the "emergency vehicle" statute, even under the common law, and especially under the Act, is inapplicable to a police chase—the only question being whether the Act's immunity is lost if the police car is involved in the collision. Its reliance on "the Varlaro line of cases" includes observations inconsistent with *Tice, e.g.,* that there is nothing in the law that immunizes a police officer for negligent operation of a vehicle in a chase, the opposite of what both that court and this Court held in *Tice.* In short, the opinion below, despite *Tice,* seems to seek to restrict police immunity during pursuit in accord with policy goals that are inconsistent with those found in *Tice.*

 An officer pursuing an escaping person faces many difficult decisions: whether to pursue at all; how aggressively to pursue; how to balance the risk of injury inevitably involved in the chase against the risk to society of not pursuing; how to evaluate the apparent minor guilt of fleeing against the potentially greater guilt implicit in flight; and how to assess society's interest in enforcing

---

[3] The Appellate Division held as a matter of law that the Tort Claims Act did not confer immunity under the facts of this case and found liability based on the emergency vehicle provisions of the Motor Vehicle Code, *N.J.S.A.* 39:4–91, and pre-code common law, specifically *Varlaro v. Schultz,* 82 *N.J.Super.* 142, 197 A.2d 16 (App.Div.1964). The court below read *Varlaro* as announcing the rule of law that an emergency vehicle driver, including a police officer engaged in a high speed chase, is subject to the same standard of negligence as an ordinary driver. *Fielder II,* 274 *N.J.Super.* at 490, 644 A.2d 666. We find no such rule announced in *Varlaro.* That case merely held that the language of the emergency vehicle statute did not shift to the plaintiff the burden of proving that he drove with "due regard for the safety of all persons."

Further, having decided that there can be no difference in outcome depending on the happenstance of which vehicle is involved in the collision, were we restricted to common-law precedent for our holding, we would find *Roll* to be determinative of the outcome in this case.

the law. All of these are difficult law enforcement questions, amenable to legislative treatment or, in its absence, judicial treatment. They are most difficult questions. Here, the Legislature has spoken and we have so ruled: police officers may pursue without being inhibited by the threat of potential civil liability for injuries if their actions are thereafter deemed to have negligently caused them; they need not give up or moderate the chase because of that threat.[4] We so ruled in *Tice*, holding that even though the officer's negligent pursuit may have caused the death of two people, the officer was immune.

That policy cannot be squared with the Appellate Division's decision. It cuts into the heart of it. The legislative intent to free officers from the threat of civil liability is cancelled by the knowledge that if it is their car that collides, there is no immunity—they are liable. The risk of accident, injury, and death, which stems from the police car and the pursued car, inheres in every inch of the way in such a pursuit: it inheres in its commencement, its continuance, its intensity, and its sometimes disastrous outcome. Officers are told to conduct that pursuit without regard to civil liability: if aggressive pursuit is otherwise warranted, notwithstanding the serious risks attendant upon a high-speed chase, neither the decision to pursue nor the decision to continue, nor the manner in which it is conducted should be affected by the threat of civil liability. That message, and the policy it reflects, is erased if the police officers are told they will be liable if *their* cars are involved in collisions. They cannot be expected to pursue aggressively and cautiously at the same time; they cannot be expected to pursue aggressively without fear of liability for causing the risk of the pursued car's driving if the risk of their own driving, just as likely to cause injury, each risk substantially the mirror image of the other, may bring them to court if they happen to be the one involved in the collisions.

---

[4] We observe that the threat consists not only of the possibility of a judgment of liability, but also the expense and inconvenience of defending a suit.

The Appellate Division decision clearly diminishes the risk of negligently caused accidents, but just as clearly diminishes the effectiveness of pursuit. As a practical matter, it cancels the purpose found as the basis of immunity in *Tice* and *Roll.* The impact on the officer's willingness to pursue and aggressiveness in pursuit may be more complex than what we have described above, but it makes for a scheme of policy and immunity that would be most difficult for an officer to understand. It tells officers to pursue aggressively if the other car is going to get in an accident, but to pursue carefully if they are going to get into an accident, when they have not the slightest idea who is going to get into an accident, during the very same indivisible pursuit. It makes sense only if you wish to limit or terminate the immunity; it makes sense only if you believe the policy is wrong.

Perhaps it is. But that is not for us to decide. We do not seek a means of finding compensation in an immunity statute any more than we seek a means of finding immunity in a compulsory insurance statute.

We believe that the effect of the decision below, if followed, is not limited to high-speed vehicle pursuit cases. Its distinction granting law enforcement immunity only when the offender makes contact but not when the police do apparently would apply to apprehending not just "escaping persons," but escaping prisoners and those resisting arrest. No great imagination is needed to demonstrate its consequences: when police are quelling a bar room brawl, or are involved in the apprehension of one or more armed and highly dangerous criminals, or are attempting to arrest violent assaultive people embedded in a large crowd of demonstrators, the inevitable risk of injury from both police and offenders is apparent. The threat to law enforcement of civil liability in this melee in the event of police-caused injury would destroy the purpose of the immunity. Using part of the same quotation relied on by the Appellate Division in *Roll:* " '[S]uch thinking would place a police officer in the same category as the Marquis of Queensbury in a pier six brawl.' " *Roll, supra,* 94 *N.J.Super.* at

537, 229 *A.*2d 281 (quoting *Wrubel v. State of New York,* 11 *Misc.*2d 878, 174 *N.Y.S.*2d 687, 689 (N.Y.Ct.Cl.1958)).

We do not suggest the Legislature favors law enforcement without concern for injuries to third parties, injuries to the public. The Legislature assumed, as we do, that police try and will continue to try to avoid causing any such injuries, either directly or indirectly. The legislative goal simply was to free law enforcement from the threat of civil liability, so that it could function effectively to protect the public in these most difficult and dangerous situations, guided always by established professional standards, and substantially constrained by the criminal law, *see, e.g., N.J.S.A.* 2C:3–7, 3–9, and 30–2, but not inhibited by the threat of civil lawsuits, absent willful misconduct. The decision below could impair that effectiveness not just in a car chase, but in this entire area of law enforcement involving apprehending and arresting offenders, involving situations when their effectiveness may be critical to the safety of many people.

### III

 Under the New Jersey Tort Claims Act (the "Act"), a public entity is immune from liability for injury unless there is a specific exception included in the Act itself which provides for liability. *N.J.S.A.* 59:2–1a; *Tice, supra,* 133 *N.J.* at 355, 627 *A.*2d 1090; *Chatman v. Hall,* 128 *N.J.* 394, 404, 608 *A.*2d 263 (1992). When liability is established under the Act, it is still subject to immunity specified in the Act as well as any common-law immunity which predated the Act. *Tice, supra,* 133 *N.J.* at 355, 627 *A.*2d 1090. With respect to public entities, "the Act was clearly intended to reestablish a system in which immunity is the rule, and liability the exception." *Bombace v. City of Newark,* 125 *N.J.* 361, 372, 593 *A.*2d 335 (1991). "When both liability and immunity appear to exist, the latter trumps the former." *Tice, supra,* 133 *N.J.* at 356, 627 *A.*2d 1090; *Rochinsky v. New Jersey Dep't of Transp.,* 110 *N.J.* 399, 408, 541 *A.*2d 1029 (1988).

The primary liability imposed upon public entities by the Act results from the application of the doctrine of *respondeat superior*. *Tice, supra*, 133 *N.J.* at 355, 627 *A.*2d 1090. "A public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances." *N.J.S.A.* 59:2–2a. The Act further provides, however, that the "public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable." *N.J.S.A.* 59:2–2b. The liability of Neptune Township then depends on whether Officer Jenkins can be held liable for Robin Fielder's injury. If Officer Jenkins is protected by any immunity, either under the Act or from some other source, that immunity extends to any *respondeat superior* liability on the part of Neptune Township as well.

Unlike the immunity of public entities, the immunity of public employees under the Act is the exception rather than the rule. "Except as otherwise provided in this [A]ct, a public employee is liable for injury caused by his act or omission to the same extent as a private person." *N.J.S.A.* 59:3–1a. However, the Act also provides that the public employee's liability for injury "is subject to any immunity of a public employee provided by law...." *N.J.S.A.* 59:3–1b. Therefore, although the Act itself provides for liability as a general rule, the use of the term "any immunity ... provided by law" suggests that the source of immunity could be the Act itself, some other statute, or common law. *Chatman, supra*, 128 *N.J.* at 404–05, 608 *A.*2d 263.

## IV

In several respects, our holding today was presaged by *Tice*, where we found that the policy considerations that form the basis for immunity under section 5–2b supported a construction immunizing both the employee and the public entity for all acts of negligence related to the pursuit of an escaping person. There we found that as the negligent actions of a public employee or entity

in connection with parole are immune, so are the negligent actions of a public employee or entity in connection with the pursuit of an escaping person. *Tice, supra,* 133 *N.J.* at 367, 380, 627 *A.*2d 1090.

We find no meaningful distinction between *Tice* and this case. The language of section 5–2b encompasses injuries caused directly by either the pursuing officer or the escaping person. In construing the statute, the negligence of the police officer must be assumed, for without such negligence, any injuries would be caused solely by the escaping person, and there would be no need for immunity. *Id.* at 363, 627 *A.*2d 1090. The statute is implicated only when the negligence of both the officer and the escaping person have caused the accident and the resulting injuries: the escaping person has initiated the need for pursuit by failing to obey a police command, and the officer has, in some manner, negligently effectuated the pursuit. In effect, whenever the statute applies, the officer and the escaping person may be deemed concurrent causes of any injuries that result from the pursuit.

To deny immunity when the officer is negligent would be to "read the statute as if it said . . . 'caused *solely* by an escaping or escaped person.'" *Id.* at 366, 627 *A.*2d 1090. Such a reading would drain the statute of all meaning, for if caused solely by the escaping person, there would be no need for the immunity. *Ibid.* Although a concurrent cause of the injuries, the officer is immune because the statute applies to those injuries caused by both the escaping person and the police officer. *Id.* at 367, 627 *A.*2d 1090. In *Tice,* although the officer was not involved in the accident, we did not ignore the causative role of the officer. Here, although the officer was involved in the accident, we likewise do not ignore the causative role of the escaping person. Consistent with the treatment of the words "caused by" in *Tice,* section 5–2b applies to any injuries resulting from the pursuit of an escaping person, whether the result of a collision with the pursuing officer or the escaping person.

To grant immunity where the escaping person collides, but to deny immunity where the officer collides, moreover, defeats the

purpose of section 5–2b, grounding immunity solely on chance, rather than the conduct of the officer. As we noted in *Tice,* such a distinction is "based on a circumstance dependent totally on chance—the chance that the innocent vehicle will get to the intersection when the pursuing police car is crossing it rather than when the suspect's car is." *Id.* at 371, 627 *A.*2d 1090. Although the officer who collides with a third party directly causes injuries, that officer's negligence may be no different than that of an officer who avoids a collision. As noted by Justice O'Hern, to deny immunity generally would

> force officers into a position where doing what is right is subordinated to doing what is most insulated in terms of exposure to liability. "In their routine work, police officers must be free to make split-second judgments in good faith based on their experience and training without fear of personal liability."
>
> [*Tice, supra,* 133 *N.J.* at 384, 627 *A.*2d 1090 (O'Hern, J., concurring) (quoting *Report of the Attorney General's Task Force on Police Vehicular Pursuit* 8 (April 1993) (quoting *Travis v. Mesquite,* 830 *S.W.*2d 94, 103 (Tex.1992) (Coryn, J., concurring))).]

Creating an exception to the general rule of immunity, depending on whether the officer is involved in the accident, would swallow the rule of immunity, deterring the officer not from acting negligently but from pursuing at all, subordinating doing what is right to doing what is most insulated from liability.

It has been suggested that the Legislature intended the immunity of 5–2b to be narrower than 5–2a. Certainly, the difference in language suggests that possibility. We believe, however, that the difference is not at all attributable to such intent but rather attributable solely to the Legislature's clear focus on the well-defined source of potential liability that it wished to immunize. The Legislature did not use the language of 5–2b in drafting 5–2a—which would have resulted in defining the immunity in terms of "any injury caused by a paroled or released prisoner"—because its concern was not with prisoners as such but with a very specific class of lawsuits: those based on alleged negligence in deciding to parole or release prisoners, or in setting terms and conditions of parole or release that were not sufficiently restrictive, or in deciding *not* to revoke parole. (We suspect that this is the

intended legislative meaning despite the subsection's language.) The Legislature apparently wished to relieve public employees making discretionary decisions of concerns that otherwise sound determinations might lead to civil liability. More specifically, if the authorities in their best judgment thought that parole or release was warranted, the Legislature did not want it denied just to avoid a lawsuit; and the same reasoning applies where sound judgment of the authorities called for terms and conditions not as restrictive as those that might better protect against civil liability, or where sound judgment called for a decision not to revoke parole, but the possibility of a lawsuit might argue for revocation.

Given that clear purpose of 5–2a, we do not find any intent, one way or the other, concerning public employees whose direct contact with someone causes injuries—that apparently being the thrust of the argument describing the 5–2a immunity as "broader" than 5–2b (where such direct contact is supposedly not immunized)—because the relative infrequency of such direct contact injuries in this context makes it unlikely that the Legislature would have even considered the possibility. More than that, however, we find it unlikely that the Legislature would have intended a broader grant of immunity in order to encourage public entities and employees to parole or release prisoners than that grant of immunity designed to encourage them to capture and arrest escaping prisoners. Stated bluntly, we doubt that the Legislature in granting immunity was more committed to the encouragement of liberal parole than the encouragement of vigorous law enforcement.

We acknowledge room for debate on this issue based on the language of the Act. As in *Tice*, where the Court decided the critical question whether "escaping person" included someone eluding the police in a vehicle pursuit, so here, the language "any injury caused by an escaping or escaped person" could be construed to mean "caused directly" by such person rather than "caused by" in the usual tort negligence sense—generally including injuries directly or indirectly caused. And although we dis-

agree, we understand that the language difference of 5–2b and 5–2a suggests some difference in the nature of the immunities granted. Given our conclusion in *Tice,* however, that the legislative goal of 5–2b(2) was to encourage vigorous law enforcement free of the inhibition of potential civil liability, we remain convinced that the Legislature could not have intended to grant immunity when the pursued vehicle was involved in the collision but to deny immunity when the collision involves the police vehicle. It makes no sense unless one rejects that legislative purpose and assumes that the immunity has nothing to do with vigorous law enforcement and is concerned only with saving money by depriving victims of compensation, in other words immunity whose only purpose is immunity. If, however, we agree that this was the legislative purpose (presumably accompanied by financial motivation) then just as we are adjured by the Act not to devise inventive causes of action to avoid the fair legislative intent to confer immunities, Comment to *N.J.S.A.* 59:2–1, for the same reason we should not let imprecision of legislative expression defeat this legislative purpose.

We note that *Roll* was based on the same law enforcement policy in granting immunity to pursuing police officers when the pursued vehicle was involved in the collision. Those who agreed with our analysis of *Roll* as a common-law source of immunity independent of 5–2b(2) but who, given the section's language, disagree with the applicability of 5–2b(2) when the officer's car is involved in the collision, must decide whether *Roll* is to be confined strictly to its facts. In *Tice,* we unanimously found that *Roll* conferred law enforcement immunity, and we believe that immunity, given its policy basis, applies regardless of which car hits which. No reasoned distinction can immunize the police if the pursued car crashes but yet expose them to liability if it is their car that crashes, at least if the *Roll* immunity is read as it was in *Tice.* We question whether the Act's mandate, importing common-law immunity not provided for in the Act, is honored when it is restricted to the facts of the common-law case in disregard of its immunity policy that, we believe, is frustrated by such restriction.

In construing the section to apply to injuries caused by officers in pursuit of an escaping person, we reiterate our conclusion that section 5–2b provides absolute immunity, absent willful misconduct. "Our sense of the intent of the section is that it immunizes absolutely all negligence of the public entity or the public employee that when combined with the conduct of an escaping or escaped prisoner or person leads to an injury." *Tice, supra,* 133 *N.J.* at 367, 627 *A.*2d 1090. Whether the negligent conduct involves the initiation, continuation, or conduct of the pursuit makes no difference: it is immune.

## V

As we recognized in *Tice,* the only limitation on section 5–2b(2) immunity is that found in the Act itself. *N.J.S.A.* 59:3–14 provides, "Nothing in this act shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct." Section 2–10 of the Act further provides that "[a] public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct." There have been no allegations of fraud, malice, or criminal conduct. However, the opinion of the Appellate Division suggests that the record in this case provides "a potential basis for a finding" of willful misconduct. *Fielder II,* 274 *N.J.Super.* at 495, 644 *A.*2d 666.

This Court has not previously had the occasion to define what constitutes "willful misconduct" in the context of a police pursuit. However, in deciding that parental immunity did not apply in the face of "willful and wanton misconduct," we analyzed the difference between willful misconduct and negligence. *Foldi v. Jeffries,* 93 *N.J.* 533, 461 *A.*2d 1145 (1983). "The standard is ... [an] intermediary position between simple negligence and the intentional infliction of harm." *Id.* at 549, 461 *A.*2d 1145. Although it is clear that willful misconduct is something more than mere negligence, "[t]here is no simple formula which will describe with

exactness the difference between negligence and willful and wanton misconduct. The concept of misconduct ranges in a number of gradations from slight inadvertence to malicious purpose to inflict injury." *McLaughlin v. Rova Farms, Inc.*, 56 *N.J.* 288, 305, 266 *A.*2d 284 (1970).

Prior decisions have suggested that willful misconduct is the equivalent of reckless disregard for safety. In *McLaughlin, supra,* we held that

> in order to recover for injuries allegedly produced by willful and wanton misconduct, it must appear that the defendant with knowledge of existing conditions, and conscious from such knowledge that injury will likely or probably result from his conduct, and with reckless indifference to the consequences, consciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result.
>
> [*Id.* at 305, 266 *A.*2d 284 (citations omitted).]

Although willful misconduct need not involve the actual intent to cause harm, *Mahoney v. Carus Chemical Co.*, 102 *N.J.* 564, 574, 510 *A.*2d 4 (1986), there must be some knowledge that the act is wrongful.

> [I]n order to satisfy the requirement of willfulness or wantonness there must be a "positive element of conscious wrongdoing." Our cases indicate that the requirement may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences.
>
> [*Berg v. Reaction Motors Division, Thiokol Chemical Corp.*, 37 *N.J.* 396, 414, 181 *A.*2d 487 (1962) (citations omitted).]

" 'Willful misconduct' is the commission of a forbidden act with actual (not imputed) knowledge that the act is forbidden. It is more than an absence of 'good faith.' 'Willful misconduct' does not refer to negligence; it is much more." *Marley v. Borough of Palmyra*, 193 *N.J.Super.* 271, 294–95, 473 *A.*2d 554 (Law Div. 1983).

Like many legal characterizations, willful misconduct is not immutably defined but takes its meaning from the context and purpose of its use. While its general contours, given its language, are similar in all contexts, it may differ depending on the common-law rule or the statute to which it is relevant, and perhaps even within such rule or statute different depending on the facts. For

instance, the definition of willful misconduct in *Foldi, supra,* a parent/child tort case, may or may not accord with the meaning intended by the Legislature in an unrelated statute. And within a statute like the Tort Claims Act, the precise definition might differ where the role of willful misconduct is to impose liability in numerous situations where it would otherwise not exist, for the reasons and purposes of imposing liability may differ in those situations and call for differences in the definition and application of willful misconduct. We therefore do not presume to define willful misconduct in any context other than police vehicular pursuit under 5–2b(2).

There is no question that police vehicular pursuits involve the risk of harm, not only to those involved in the pursuit but, as this case so clearly illustrates, to innocent bystanders as well. We acknowledge that conduct of police officers during vehicular pursuits could easily be classified as reckless under more conventional circumstances. However, in defining this standard we are mindful of the legislative goal of promoting vigorous law enforcement by removing the threat of civil liability. We therefore hold that in the context of a police officer's enforcement of the law, including the pursuit of a fleeing vehicle, willful misconduct is ordinarily limited to a knowing violation of a specific command by a superior, or a standing order, that would subject that officer to discipline. Because a direct order to terminate a pursuit, or not to pursue at all under certain circumstances, would be intended to minimize the potential harm, officers who willfully disregard such commands would be aware that to do so would be to greatly enhance the risk of injury, not only to themselves but to the public at large.[5]

---

[5] We note that since the occurrence of the events in this case, the Attorney General has issued revised uniform guidelines to be followed by all New Jersey law enforcement agencies when conducting vehicular pursuits. *New Jersey Vehicular Pursuit Policy of 1993, reprinted in Report of the Attorney General's Task Force on Police Vehicular Pursuit* 55 (April 1993). The implementation of this policy on a state-wide basis, including the addition of vehicular pursuit training requirements, should assist in achieving the balance between the promotion of vigorous law enforcement and the safety of the public.

██ The phrase "willful misconduct" in this context naturally commands the meaning we here attribute to it: the knowing failure to follow specific orders, "knowing" that there is an order and willfully failing to follow it, *i.e.*, intentionally failing to obey the order. More particularly, willful misconduct in a police vehicular chase has two elements: 1) disobeying either a specific lawful command of a superior or a specific lawful standing order and 2) knowing of the command or standing order, knowing that it is being violated and, intending to violate it. Where the command or order is not only specific but clearly has no exceptions—expressed or implied—willful misconduct is not affected by the good faith of the public employee who believes he or she somehow had a right to knowingly and willfully disobey.

██ By virtue of the Act, the defense of good faith in the enforcement or execution of the law is unavailable when the public employee is guilty of willful misconduct. Proof of lack of good faith, however, does not equate with willful misconduct, because the situation may not even involve specific commands or standing orders. Lack of good faith may be factually relevant, however, to disputes over public employees' claims that they did not know of

---

Because the 1993 Pursuit Policy was not in effect at the time of the events in this case, the precise legal significance of those guidelines is not a subject of this appeal. However, as the Pursuit Policy indicates, the Attorney General apparently intended that these guidelines would be adopted, with local variations as warranted, by every law enforcement agency in the state. *Id.* at 56. We assume that when adopted by a local police department they would have the effect of standing orders, a knowing and willful violation of which might constitute willful misconduct ·depending on the nature of the guideline violated. For example, Guideline III B. prohibits more than two police vehicles from becoming involved in a pursuit unless otherwise directed by a supervisor. *Id.* at 60. Because it does not provide for individual discretion, a knowing and willful violation of that guideline could· constitute willful misconduct. By contrast, Guideline I A.1. states that while only certain offenses justify pursuit, an officer may pursue any violator who that officer reasonably believes presents a threat to the public. *Id.* at 58. Because that guideline clearly allows an individual officer the discretion to determine when pursuit is appropriate, a mere error in judgment under such circumstances, even though technically a violation of the guideline, would not constitute willful misconduct.

the order, or that they did not know they were violating it, in other words, relevant to the state of mind that is part of the definition of willful misconduct.

This definition of willful misconduct in police pursuits, conforming generally to many of the sources cited above, accords with the purpose of 5–2b(2) in providing immunity. It is a definition not likely to result in jury trials in which the claims are really based on gross negligence or even recklessness. It should not be interpreted to conflict with the legislative purpose of removing the inhibiting threat of civil liability from effective law enforcement, for there is nothing effective in "law enforcement" that results from willful misconduct so defined. Given its definition, police officers pursuing their duties will rarely be concerned with its applicability to them. It will have some inhibiting effect, but only the one intended by the Legislature, and for good reason.

Having defined the standard for willful misconduct we must determine whether the requirements for summary judgment have been met. Summary judgment shall be granted if the pleadings, depositions, admissions, along with any affidavits, establish no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *R.* 4:46–2; *Millison v. E.I. du Pont de Nemours & Co.*, 101 *N.J.* 161, 167, 501 *A.*2d 505 (1985) (citing *Judson v. Peoples Bank & Trust Co. of Westfield*, 17 *N.J.* 67, 74, 110 *A.*2d 24 (1954)). On a motion for summary judgment, "[a]ll inferences of doubt are drawn against the moving party and in favor of the opponent of the motion." *Shanley & Fisher, P.C. v. Sisselman*, 215 *N.J.Super.* 200, 211, 521 *A.*2d 872 (App.Div.1987); *Allstate Redevelopment v. Summit Assoc.*, 206 *N.J.Super.* 318, 326, 502 *A.*2d 1137 (App.Div.1985). "[A] party opposing a motion is not to be denied a trial unless the moving party sustains the burden of showing clearly the absence of a genuine issue of material fact." *Allstate Redevelopment, supra,* 206 *N.J.Super.* at 327, 502 *A.*2d 1137. Our role in reviewing a motion for summary judgment is merely to determine whether there is a genuine issue of material fact, but not to decide it.

*Judson, supra,* 17 *N.J.* at 73, 110 *A.*2d 24; *Baran v. Clouse Trucking, Inc.,* 225 *N.J.Super.* 230, 233, 542 *A.*2d 34 (App.Div.), *certif. denied,* 113 *N.J.* 353, 550 *A.*2d 463 (1988).

Although we are satisfied that Officer Jenkins is entitled to immunity under *N.J.S.A.* 59:5–2b(2) as a matter of law, in order to justify summary judgment, he must establish that there is no genuine issue of material fact of whether his conduct constituted willful misconduct as we have defined it today. More specifically, Officer Jenkins must prove that there is no genuine issue of material fact with regard to any of the elements of the willful misconduct standard: whether there was a direct order not to engage in the pursuit or not to continue the pursuit, whether Officer Jenkins knew of such an order, and whether he knowingly and willfully violated that order.

When viewed in the light most favorable to the parties opposing summary judgment, we conclude that a genuine issue of material fact may exist with respect to Officer Jenkins' apparent violation of an internal department policy when he left his designated zone of patrol to participate in the pursuit of the McGhee motorcycle. It is not clear from the record whether that policy was the equivalent of an unqualified standing order or whether that policy allowed individual officers to exercise discretion based on their assessment of a given situation. Both of these elements are material to determining whether Officer Jenkins' conduct constituted willful misconduct, for if there was such an order, and if he knew he was violating it and that it permitted no discretion, his conduct in joining the pursuit was a violation of a direct command. This issue is a close one, but we conclude that summary judgment is not warranted.

The record also demonstrates, according to Jenkins' own description of the pursuit, that he was travelling eastbound on Route 33 at speeds up to sixty-five miles per hour between intersections and going through red lights. At some point during the pursuit, Officer Jenkins heard Sergeant Blecki's radio transmission ordering Neptune Township officers engaged in the pursuit to termi-

nate the pursuit should the situation become dangerous to themselves or others. It is not clear from the record exactly when he heard the transmission but he stated that he heard it before entering the intersection where the accident occurred. Based on this record, a reasonable fact finder could conclude that Officer Jenkins heard Sergeant Blecki's message when the pursuit was in full swing—while he was exceeding the posted speed limit and proceeding through red traffic signals without stopping. A fact finder could conclude not only that his conduct was dangerous but that he knew it was dangerous, to himself as well as to innocent third parties, and that he continued the pursuit in knowing and willful violation of Sergeant Blecki's instructions. Obviously, given the implied discretion allowed to the officer by the command (to decide whether further pursuit was dangerous to himself or others), the fact finder could find that Officer Jenkins honestly, no matter how mistakenly, believed there was no such danger and that he was not violating the command. In that case, there would be no willful misconduct.

Because we cannot conclude based on this record that there is no genuine issue of material fact concerning whether Officer Jenkins' conduct constituted willful misconduct, summary judgment is not warranted.

In both of these instances (leaving his zone; continuing pursuit after Blecki's command), resolution of the issue of willful misconduct necessarily involves a determination of Officer Jenkins' state of mind. That fact does not preclude summary judgment, but requires the most careful analysis before granting it. *See Sisselman, supra,* 215 *N.J.Super.* at 212, 521 *A.*2d 872 (citing *Ruvolo v. American Casualty Co.,* 39 *N.J.* 490, 500, 189 *A.*2d 204 (1963)) (concluding that courts should be "particularly hesitant in granting summary judgment where questions dealing with subjective elements such as intent, motivation and duress are involved"). The summary judgment question in both instances is close; while we have decided plaintiff should have the opportunity to present her

evidence, the trial court may nevertheless decide, after hearing all of the evidence, not to submit either of these issues to the jury.

Therefore, although defendants are otherwise entitled to immunity under section 5–2b(2), summary judgment for Officer Jenkins is not warranted because there is a genuine issue of material fact concerning whether Officer Jenkins' conduct amounted to willful misconduct. However, Neptune Township is entitled to summary judgment. If Officer Jenkins' conduct is found to constitute willful misconduct, the Township is not liable for his actions. *N.J.S.A.* 59:2–10. If, however, his conduct does not rise to the level of willful misconduct, both he and the Township are granted immunity under section 5–2b(2).

## VI

Having determined the applicability of *N.J.S.A.* 59:5–2b(2), we now address an alternate basis for immunity: the qualified immunity afforded by *N.J.S.A.* 59:3–3. Under that section, "[a] public employee is not liable if he acts in good faith in the execution or enforcement of any law." *N.J.S.A.* 59:3–3. The court below concluded that section 3–3 "can[not] be reasonably applied to behind-the-wheel conduct," *Fielder II*, 274 *N.J.Super.* at 494, 644 *A.*2d 666, and that it "does not apply to negligent operation by a police officer of his patrol car." *Fielder I*, 263 *N.J.Super.* at 236, 622 *A.*2d 906. We disagree.

There is no question that police officers engaged in the pursuit of fleeing drivers are acting within the scope of their duty to uphold the motor vehicle laws, and are therefore executing or enforcing the law within the meaning of *N.J.S.A.* 59:3–3. Police officers are charged with enforcement of the motor vehicle laws, *N.J.S.A.* 39:5–1, and are authorized to arrest, without a warrant, any person who violates the motor vehicle laws in their presence. *N.J.S.A.* 39:5–25. As the court in *Roll* stated, "[I]t is the duty of a police officer to apprehend those whose reckless driving makes use of the highways dangerous to others." *Roll, supra,* 94 *N.J.Super.* at 536, 229 *A.*2d 281. We note that the flight of a

driver who received a signal to stop from an officer is not only a criminal offense, but that a greater penalty is imposed if the flight creates a risk of injury or death to any person, and that flight involving the commission of a motor vehicle offense is presumed to create such a risk. *N.J.S.A.* 2C:29–2b.

Although in *Tice* we questioned the Appellate Division's conclusion that summary judgment was appropriate in that case, we implied approval of its application of section 3–3. *Tice, supra,* 133 *N.J.* at 374, 627 *A.*2d 1090. Indeed, Justice O'Hern, in his concurrence, stated that he would have preferred that immunity be afforded under that section. *Id.* at 382, 627 *A.*2d 1090. We explicitly questioned, moreover, the Appellate Division's conclusion in *Fielder I* that the statute does not apply to "a high speed chase." *Id.* at 371, 627 *A.*2d 1090. That conclusion did not accord then, and does not accord now, "with our understanding of that section." *Ibid.* That conclusion, we believe, is inconsistent with the application of section 3–3 to other conduct by officers acting within the scope of their duties, and ignores the ultimate question, whether the officer in executing or enforcing a law acted in good faith. *See, e.g., Gurski v. State Police Dep't,* 242 *N.J.Super.* 148, 576 *A.*2d 292 (App.Div.1990) (where officers executing a search warrant allegedly destroyed personal property, used a telephone without permission, dry-fired weapons, and verbally abused and frightened plaintiff's wife and children); *Lear v. Township of Piscataway,* 236 *N.J.Super.* 550, 566 *A.*2d 557 (App.Div.1989) (where officers transporting an arrested person used restraining shackles); *Wood v. City of Linden,* 218 *N.J.Super.* 11, 526 *A.*2d 1093 (App.Div.1987) (where officers attempting to serve a no bail arrest warrant allegedly intentionally rammed the fleeing vehicle); *Evans v. Elizabeth Police Dep't,* 236 *N.J.Super.* 115, 564 *A.*2d 462 (App.Div.1983) (where officer allegedly negligently conducted identification of suspect).

Good faith immunity under section 3–3 has two alternate components. *Tice, supra,* 133 *N.J.* at 374, 627 *A.*2d 1090; *Bombace, supra,* 125 *N.J.* at 374, 593 *A.*2d 335. Adopting the analysis

used in federal civil rights cases, our courts have ruled that to obtain summary judgment, a public employee must establish that her conduct was "objectively reasonable." *Hayes v. Mercer County,* 217 *N.J.Super.* 614, 622, 526 *A.*2d 737 (App.Div.), *certif. denied,* 108 *N.J.* 643, 532 *A.*2d 226 (1987); *Gurski, supra,* 242 *N.J.Super.* at 162, 576 *A.*2d 292; *Lear, supra,* 236 *N.J.Super.* at 553, 566 *A.*2d 557; *Brayshaw v. Gelber,* 232 *N.J.Super.* 99, 109–10, 556 *A.*2d 788 (App.Div.1989). Where a public employee was not acting objectively reasonably, a second line of defense, which may be raised at trial, remains available: subjective good faith. *Hayes, supra,* 217 *N.J.Super.* at 622, 526 *A.*2d 737. The question of subjective good faith, however,

> must be sensitively treated in light of all the attendant facts and circumstances which give color and meaning to otherwise neutral conduct. The undertaking can rarely succeed except after a presentation of all the evidence through direct and cross-examination and until an opportunity has been afforded to observe the demeanor of the witness[ ].
>
> [*Evans, supra,* 236 *N.J.Super.* at 117, 564 *A.*2d 462.]

Because it involves subjective elements, the defense of subjective good faith will ordinarily be better assessed on a full record. *See Sisselman, supra,* 215 *N.J.Super.* at 212, 521 *A.*2d 872 (citing *Ruvolo, supra,* 39 *N.J.* at 500, 189 *A.*2d 204).

Although section 3–3 applies generally to the tortious conduct of public employees, specifically police officers, engaged in the enforcement of the law, and although we believe it applies in the context of police pursuits, its application, compared with that of section 2b(2), does not serve the legislative purpose to the same extent. That purpose is to grant immunity to officers engaged in pursuits and thereby encourage pursuits, relieving officers of the expense of litigation and the threat of civil liability, a deterrent to pursuits. A grant of immunity for officers engaged in pursuits that rested on good faith would subject an officer's conduct to a more searching scrutiny, and would frequently require a trial on the merits to establish the reasonableness of the conduct at issue. Such a limited grant of immunity, by denying officers immunity as a matter of law, would not sufficiently support police officers engaged in pursuits, and would not adequately fulfill the legisla-

tive purpose. Although we believe that *N.J.S.A.* 59:3–3 applies to police officers engaged in pursuits, *N.J.S.A.* 59:5–2b(2), which is specifically aimed at encouraging pursuit, better serves that purpose. We, therefore, do not determine the difficult question of whether application of *N.J.S.A.* 59:3–3 could result in summary judgment on these facts and base our holding on *N.J.S.A.* 59:5–2b(2).

## VII

Although the issue was not raised by plaintiff in this case, we note that despite the provision of immunity under *N.J.S.A.* 59:5–2b(2), liability may exist under federal law, even if inconsistent with the Tort Claims Act. Although the U.S. Supreme Court has held that mere negligence is insufficient, "it has expressly declined to decide 'whether something less than intentional conduct, such as recklessness or 'gross negligence,' is enough to trigger the protections of the Due Process Clause.'" *Fagan v. City of Vineland*, 22 *F*.3d 1296, 1305 (3d Cir.1994) (*en banc*) (quoting *Daniels v. Williams*, 474 *U.S.* 327, 334 n. 3, 106 *S.Ct.* 662, 666 n. 3, 88 *L.Ed*.2d 662, 670 n. 3 (1986)). Courts generally have applied standards "ranging from 'gross negligence' to 'deliberate indifference' to 'recklessness' for section 1983 substantive due process claims." *Temkin v. Frederick County Comm'rs*, 945 *F*.2d 716, 722 (4th Cir.1991), *cert. denied*, 502 *U.S.* 1095, 112 *S.Ct.* 1172, 117 *L.Ed*.2d 417 (1992).

In the context of police pursuits, courts of appeal have differed as to whether gross negligence will suffice, or whether recklessness is required. *Compare Jones v. Sherrill*, 827 *F*.2d 1102, 1106 (6th Cir.1987) (holding that officer's conduct in pursuing suspect "d[id] not rise to the level of gross negligence and outrageous conduct necessary to sustain a section 1983 claim....") *with Roach v. City of Frederickstown*, 882 *F*.2d 294, 297 (8th Cir.1989) (stating that negligent or grossly negligent conduct does not state a claim under section 1983, and holding that officer's pursuit "d[id] not rise to the level of gross negligence and, therefore, most

certainly d[id] not rise to the level of conduct which would sustain a claim under section 1983").

More recently, however, the Third Circuit has adopted a higher standard: conduct that shocks the conscience. *Fagan, supra*, 22 *F*.3d at 1303. In *Fagan*, the court held that "the reckless indifference of government employees is an insufficient basis upon which to ground their liability for a police pursuit under the Due Process Clause," *id.* at 1306, and that "the substantive component of the Due Process Clause can only be violated by governmental employees when their conduct amounts to an abuse of official power that 'shocks the conscience.'" *Id.* at 1303. The court in *Fagan* followed the approach of the Fourth Circuit in *Temkin, supra,* 945 *F*.2d at 723, which concluded that "the standard of care applicable to [police pursuits] is the 'shocks the conscience' standard."

Thus, until the United States Supreme Court resolves the disagreement among the courts of appeal, federal liability in New Jersey may not be established for conduct that is grossly negligent or reckless, but only for conduct that shocks the conscience. Whereas grossly negligent or reckless conduct falls short of willful misconduct, conduct that shocks the conscience may in fact be more egregious than willful misconduct, and therefore the grant of immunity under federal law may be greater than that under the Act. Whatever the overlap between federal law and the Act, we simply underscore their independence from each other: "public entities and law enforcement personnel should understand that federal liability under section 1983 may exist, even if inconsistent with the Act, and if it does, the Act provides no immunity from the federal claim." *Tice, supra,* 133 *N.J.* at 375, 627 *A*.2d 1090.

## VIII

The judgment of the Appellate Division is affirmed in part and reversed in part. The matter is remanded to the trial court for further proceedings consistent with this opinion.

STEIN, J., concurring.

I concur in the Court's disposition of this appeal to the extent that it holds that summary judgment was improperly granted and remands the matter to the Law Division. I write separately to advance a different basis for the police officer's immunity under the New Jersey Tort Claims Act (the Act), *N.J.S.A.* 59:1–1 to 12–3, one that I believe better comports with the plain language of the Act.

I

The Court relies on *N.J.S.A.* 59:5–2b(2) to hold immune from civil liability a law-enforcement officer who strikes and injures a third party in the course of pursuit. That provision of the Act states that "[n]either a public entity nor a public employee is liable for * * * any injury caused by * * * an escaping or escaped person." Read literally, *N.J.S.A.* 59:5–2b(2) provides a limited source of immunity to law-enforcement officers confined to those instances in which the injury is caused primarily by the escaping party, such as when a pursued automobile strikes and injures a third party. Although the immunity provided by *N.J.S.A.* 59:5–2b(2) is narrow, that provision represents a deliberate judgment on the part of the Legislature. *Tice v. Cramer,* 133 *N.J.* 347, 388, 627 *A.*2d 1090 (1993) ("The Legislature's use of the phrase 'caused by * * * an escaping or escaped person' in section 5–2b * * * represents a considered choice.") (Clifford, J., concurring). Nevertheless, if *N.J.S.A.* 59:5–2b(2) were the only source of legislative immunity available to the pursuing officer, I would agree that the compelling legislative policy identified by the Court supports an expansive reading of that provision. However, the Legislature has provided a separate source of statutory immunity to the officer in *N.J.S.A.* 59:3–3.

*N.J.S.A.* 59:3–3 states that "[a] public employee is not liable if he acts in good faith in the execution or enforcement of any law." This Court has acknowledged the relevance of *N.J.S.A.* 59:3–3 in the context of police pursuits. In *Tice v. Cramer, supra,* 133 *N.J.*

347, 627 A.2d 1090, the Court considered whether the Act affords a police officer immunity when a car the officer had been pursuing had collided with another vehicle. Although relying on *N.J.S.A.* 59:5–2b(2) to hold that the officer was immune, the Court questioned the conclusion of the Appellate Division in *Fielder v. Jenkins*, 263 *N.J.Super.* 231, 622 A.2d 906 (1993), that "section 3–3 (good faith immunity in enforcing the law) does not apply to a high speed chase." *Tice, supra,* 133 *N.J.* at 371, 627 A.2d 1090. Justice O'Hern, concurring in *Tice,* indicated his preference "that the dismissal be upheld on the basis of the immunity afforded under *N.J.S.A.* 59:3–3," and expressed his belief "that a holding under section 3–3 would be more consistent with the internal structure and language of the Act." *Tice, supra,* 133 *N.J.* at 382, 627 A.2d 1090.

Our Court's recognition that *N.J.S.A.* 59:3–3 can serve as the source of immunity from liability arising from police pursuits is supported by the finding that the immunity accorded by that provision has potentially broad factual application. Courts have considered the application of *N.J.S.A.* 59:3–3 in various contexts, including the decision by officers to restrain an arrestee with leg shackles, *Lear v. Township of Piscataway,* 236 *N.J.Super.* 550, 554, 566 A.2d 557 (App.Div.1989), the execution by officers of a lawfully issued warrant, *Gurski v. New Jersey State Police Dep't,* 242 *N.J.Super.* 148, 162, 576 A.2d 292 (App.Div.1990), the use of certain procedures by officers to confirm the identity of an alleged suspect, *Evans v. Elizabeth Police Dep't,* 236 *N.J.Super.* 115, 116, 564 A.2d 462 (App.Div.1983), and the pursuit by officers of a car in an attempt to execute an arrest warrant on the driver. *Wood v. City of Linden,* 218 *N.J.Super.* 11, 17, 526 A.2d 1093 (App.Div. 1987).

That the plain language of *N.J.S.A.* 59:3–3, as well as the judicial construction of that provision, provides immunity to those officers who injure others in the course of a pursuit conducted in good faith is clear. Rather than extend the application of *N.J.S.A.* 59:5–2b(2) to encompass those situations not within the plain and

clear purview of the statutory language, I would apply the immunity accorded by *N.J.S.A.* 59:3–3 that the Legislature specifically has provided to police officers acting in "good faith" in the enforcement of any law.

II

Despite concluding that *N.J.S.A.* 59:3–3 "applies generally to the tortious conduct of public employees, specifically police officers, engaged in the enforcement of the law, and * * * in the context of police pursuits," *ante* at 133–34, 661 *A.*2d at 247, the Court elects not to rest its judgment on that provision. The Court does "acknowledge room for debate on this issue based on the language of the Act." *Ante* at 122–23, 661 *A.*2d at 241. Instead, the Court chooses to expand the scope of *N.J.S.A.* 59:5–2b(2) to provide a source of tort immunity, not only when an "escaping or escaped person" actually causes the injury, but also when an officer strikes the third party. That decision is premised on the belief that determining immunity by evaluating whether the officers acted in "good faith" will impair the legislative purpose of encouraging law-enforcement officers to pursue fleeing persons. By relying on its expansive interpretation of *N.J.S.A.* 59:5–2b(2), the Court's ruling imposes liability only when the officer's actions constitute "willful misconduct." *See N.J.S.A.* 59:3–14a.

The immunity provided to officers acting in "good faith" pursuant to *N.J.S.A.* 59:3–3, and the Legislature's refusal to grant the officer immunity in those cases in which the officer acts with "willful misconduct," *see N.J.S.A.* 59:3–14a, are not necessarily two sides of the same coin. *See Marley v. Borough of Palmyra,* 193 *N.J.Super.* 271, 293–95, 473 *A.*2d 554 (Law Div.1983). Although the distinction is subtle, an action lacking "good faith" does not necessarily constitute "willful misconduct." However, the distinction between a lack of "good faith" and the presence of "willful misconduct" is a narrow one.

"Good faith" is defined as "honesty of purpose and integrity of conduct without knowledge, either actual or sufficient to demand

inquiry, that the conduct is wrong. * * * Reckless action may deny good faith." *Id.* at 294, 473 *A.*2d 554. The presence of negligence does not necessarily prevent a finding of "good faith." In fact, *N.J.S.A.* 59:3-3 "provides immunity to public employees engaged in law enforcement notwithstanding their negligence, so long as they act in 'good faith.' " *Marley, supra,* 193 *N.J.Super.* at 295, 473 *A.*2d 554. Therefore, to avoid the immunity afforded to the "good faith" actions of the public employee, the complaint must allege a cause of action based on conduct more culpable than simple negligence. *Delbridge v. Schaeffer,* 238 *N.J.Super.* 323, 345, 569 *A.*2d 872 (Law Div.1989). The standard for evaluating reasonableness under 42 *U.S.C.A.* § 1983, which consists of both objective and subjective aspects of good-faith immunity, "also applies 'in determining questions of good faith arising under * * * *N.J.S.A.* 59:3-3.' " *Gurski, supra,* 242 *N.J.Super.* at 162, 576 *A.*2d 292 (quoting *Lear, supra,* 236 *N.J.Super.* at 553, 566 *A.*2d 557). New Jersey decisional law "allows immunity under section 3-3 if the public employee can show either objective or subjective good faith." *Bombace v. City of Newark,* 125 *N.J.* 361, 374, 593 *A.*2d 335 (1991).

Although "willful misconduct" is something more than the absence of "good faith," *Marley, supra,* 193 *N.J.Super.* at 295, 473 *A.*2d 554, "no simple formula [exists that] will describe with exactness the difference" between the two. *McLaughlin v. Rova Farms, Inc.,* 56 *N.J.* 288, 305, 266 *A.*2d 284 (1970). We have stated that a person acts with "willful misconduct" when that person, "with knowledge of existing conditions, and conscious from such knowledge that injury will likely or probably result from his conduct, and with reckless indifference to the consequences, consciously and intentionally does some wrongful act or omits to discharge some duty [that] produces the injurious result." *Ibid; Mahoney v. Carus Chem. Co.,* 102 *N.J.* 564, 574, 510 *A.*2d 4 (1986).

Because "good faith" and "willful misconduct" are not equivalent standards, *see Marley, supra,* 193 *N.J.Super.* at 295, 473 *A.*2d 554, the Court expresses concern that the application of *N.J.S.A.* 59:3-

3 "would subject an officer's conduct to a more searching scrutiny." *Ante* at 133–34, 661 *A.*2d at 247. If that were so, the result would follow from a legislative choice. However, I agree with the view expressed by Justice O'Hern that "[i]n fact, the immunities the two sections confer will likely converge when the contents of the 'willful misconduct' and 'good faith' exceptions to each immunity are filled out." *Tice, supra,* 133 *N.J.* at 382, 627 *A.*2d 1090 (O'Hern, J., concurring). Because the question of the subjective "good faith" of the officer "must be sensitively treated in light of all the attendant facts and circumstances [that] give color and meaning to otherwise neutral conduct," summary judgment often will be inappropriate. *Evans, supra,* 236 *N.J.Super.* at 117, 564 *A.*2d 462. Determinations of subjective intent, motivation, and knowledge on the part of the officer would normally require sworn testimony. *See Harlow v. Fitzgerald,* 457 *U.S.* 800, 816, 102 *S.Ct.* 2727, 2737, 73 *L.Ed.*2d 396, 409 (1982) ("[A]n official's subjective good faith has been considered to be a question of fact that some courts have regarded as inherently requiring resolution by a jury.").

However, to prevail on a motion for summary judgment, "a public employee need not establish his subjective, *i.e.,* actual, good faith if his conduct was objectively reasonable. Subjective good faith nevertheless remains available to a public employee as a second line of defense, which he may raise at trial even if he was not acting reasonably." *Hayes v. County of Mercer,* 217 *N.J.Super.* 614, 622, 526 *A.*2d 737 (App.Div.1987); *see also Brayshaw v. Gelber,* 232 *N.J.Super.* 99, 110, 556 *A.*2d 788 (App.Div.1989) ("[W]e are satisfied that defendant adequately established that she acted in an 'objectively reasonable' manner in the performance of her duties and, therefore, she was entitled to a qualified immunity under *N.J.S.A.* 59:3–3.").

As Justice O'Hern noted in *Tice,* high-speed police pursuits are both common and dangerous, requiring some degree of supervision. "Municipalities and local-government units will undoubtedly promulgate standards aimed at providing the police with guide-

lines concerning the appropriate time to commence and to terminate pursuits." *Tice, supra,* 133 *N.J.* at 383, 627 *A.*2d 1090 (O'Hern, J., concurring). As the Court details, the Attorney General has issued a series of guidelines governing the conduct of law-enforcement officials pursuing vehicles. *New Jersey Police Vehicular Pursuit Policy of 1993, reprinted in Report of the Attorney General's Task Force on Police Vehicular Pursuit* 55 (Apr. 1993). Those regulations are intended to be adopted and followed by each law-enforcement agency in New Jersey. *Id.* at 56. An officer who relies on and acts in accordance with those guidelines should be entitled to a finding that he or she acted with objective "good faith." *See Milton v. Nelson,* 527 *F.*2d 1158, 1159 (9th Cir.1976) ("It is clear that 'good faith' enforcement of governmental regulations is a defense to a section 1983 Civil Rights Act claim."); *cf. Harlow, supra,* 457 *U.S.* at 818, 102 *S.Ct.* at 2738, 73 *L.Ed.*2d at 410 ("Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.") (footnote omitted). A trial court could enter summary judgment in favor of a law-enforcement officer in the absence of any evidence that the officer did not act in conformity with established regulations. The determination that the officer acted with objective "good faith" would preclude a "searching scrutiny" into the officer's conduct.

### III

Summary judgment, however, is not appropriate in this case. Because the latest guidelines provided by the Attorney General were not in effect at the time of the pursuit at issue, they provide no assistance in evaluating the reasonableness of the officer's conduct. Moreover, as the Court notes, the record demonstrates that the officer might have disregarded both internal departmental policy and specific instructions to terminate the pursuit. *Ante* at 129–31, 661 *A.*2d at 244–45. Such behavior would not be

entitled to the immunity accorded those who act with objective "good faith."

I concur in the Court's judgment that summary judgment is not warranted based on this record and its decision to remand the case to the trial court. However, I would require the trial court to focus on whether the officer acted with subjective "good faith" in pursuing the vehicle, despite failing to comply with the internal policy of the department and ignoring the instructions of a superior officer, assuming that the court determines that that conduct does not itself constitute "willful misconduct." Because the question of the officer's subjective "good faith" is an "undertaking [that] can rarely succeed except after a presentation of all the evidence through direct and cross-examination and until an opportunity has been afforded to observe the demeanor of the witnesses," *Evans, supra,* 236 *N.J.Super.* at 117, 564 *A.*2d 462, the matter should be decided on a full record.

### IV

I concur in the Court's judgment remanding the matter to the trial court.

STEIN, J., concurring in the result.

*For affirmance in part and reversal in part*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and COLEMAN—6.