# RECORD IMPOUNDED

---

### NOT FOR PUBLICATION WITHOUT THE
### APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

---

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0112-23

KENNETH S. JAVERBAUM,
as guardian ad litem for A.G.,[1]

     Plaintiff-Appellant,

v.

STATE OF NEW JERSEY,
DEPARTMENT OF CHILDREN
AND FAMILIES, DIVISION OF
CHILD PROTECTION AND
PERMANENCY, IVAN RIVAS,
CHARISE SIMMONS, KESSA
CARSON, CHENEL GRANT,
JANICE BROWN, and NANCY
KHOURY,

     Defendants-Respondents,

and

CLARA MAASS MEDICAL
CENTER, EMERGENCY MEDICAL
ASSOCIATES, MICHAEL EAGAN,
M.D., ALEXSEY IKHELSON, P.A.-

---

[1] We use initials to protect the parties' privacy and the confidentiality of the proceedings in accordance with Rule 1:38-3(d)(12).

C., MEGAN MAZZEO, R.N., and
JAMIE NIGRO, R.N.,

     Defendants.

_____

Argued January 30, 2025 – Decided July 7, 2025

Before Judges Natali, Walcott-Henderson, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-1078-15.

Beth G. Baldinger argued the cause for appellant (Mazie Slater Katz & Freeman, LLC, attorneys; David A. Mazie and Beth G. Baldinger, of counsel; David M. Estes, on the briefs).

Ashleigh B. Shelton, Deputy Attorney General, argued the cause for respondents (Matthew J. Platkin, Attorney General, attorney; Donna Arons, Assistant Attorney General, of counsel; Jae K. Shim, Deputy Attorney General, on the brief).

PER CURIAM

This appeal concerns a civil action brought on behalf of A.G. by plaintiff Kenneth S. Javerbaum,[2] her guardian ad litem, to recover damages for lifelong injuries inflicted upon her by her father, J.G. Plaintiff contends as a result of the Division of Child Protection and Permanency's (DCPP) inadequate

_____

[2] While the complaint and trial court opinion correctly list Javerbaum's middle initial as "S.," other documents—most notably the trial court order and the notice of appeal—incorrectly list it as "J."

2

investigation, they failed to identify the danger J.G. posed to A.G. and, therefore, failed to prevent the harm she sustained.

Plaintiff appeals from an April 24, 2023 order which granted summary judgment in favor of the DCPP, Ivan Rivas, Charise Simmons, Kessa Carson, Chenel Grant, Janice Brown, and Nancy Khoury (collectively the DCPP defendants), and dismissed plaintiff's complaint with prejudice. Based upon our review of the motion record and applicable law, we affirm in part, reverse and vacate in part, and remand for further proceedings.

I.

A.G. was born in October 2011 to S.T. and J.G., her mother and father, respectively. A few days after her birth, DCPP received a report from a hospital staff member indicating both A.G. and S.T. tested positive for methadone. Despite the positive test, the staff member reported there were "no concerns of abuse or neglect," and that S.T. was currently enrolled in, and compliant with, methadone treatment, as well as counseling and parenting classes. The staff member, however, informed DCPP that S.T. had two other children who were no longer in her custody.

With respect to J.G., the hospital staff member explained he was "reported to be 'slow'" and collected supplemental security income disability (SSI), but

there were "no known domestic violence, mental health[,] or criminal concerns in the home." A.G. was discharged with her mother and father the same day the report was made.

The family's case was assigned to DCPP caseworker Rivas, working under supervisor Simmons. Rivas and Simmons held a pre-investigative conference on October 28, 2011. After the conference, Rivas attempted to visit the family, first at the hospital, then at their home, but was unable to make contact until October 31, 2011. On his first visit, Rivas noted A.G. was "appropriately clothed, swaddled, and covered with a hat and blanket while she slept" in her bassinet. He also noted "a large amount" of formula on hand, as well as "a number of essentials for the newborn," including furniture and diapering supplies.

Rivas spoke to S.T. about her substance use history and learned she had been enrolled in methadone treatment at Spectrum Healthcare since late May or early June 2011, and had not relapsed since. He was able to verify S.T.'s enrollment in and compliance with the program and her participation in counseling and parenting groups. According to Rivas' notes, he also spoke to S.T. about her other children. She explained she had not seen them in a long time but believed they had been adopted by a relative of their father.

A-0112-23

Rivas also spoke with J.G. during the visit and asked about drug and alcohol use, which J.G. denied. J.G. further denied he was "slow," and said Rivas only assumed that because he was enrolled in SSI.[3] Rivas found J.G. "attentive" and able to "understand and answer . . . questions in a clear manner." He also saw J.G. "rush[]" to "soothe" A.G. when she began to cry.

In his report memorializing the visit, Rivas stated A.G. appeared "safe in the care of her biological parents, as they have all the essentials needed and more to adequately care for" her, and S.T. was "in compliance with her drug treatment." Nonetheless, in the same report, supplemented by a family risk assessment form, Rivas rated the risk of neglect as a six, the risk of abuse as a two, and the scored risk level as high, accompanied by a designation of "unsafe." He recommended referring J.G. to a Certified Alcohol and Drug Counselor (CADC) "due to his past criminal history,"[4] as well as following up with the family's clinicians, with provision of appropriate services, and potential litigation to follow.

---

[3] A social security evaluation performed in 2007 diagnosed J.G. with "anxiety disorder," "alcohol abuse," "[c]annabis dependence," and "mild mental retardation."

[4] It is unclear what Rivas meant by "past criminal history" as that information is not included in his report.

On November 1, 2011, S.T. took A.G. to a scheduled pediatrician visit where no concerns of abuse or neglect were reported. Three days later, Rivas visited the family's home and again found it "warm, neat[,] and free of any apparent safety hazards," and equipped with "functioning [utilities]." There was "plenty of formula" for A.G., who was "appropriately dressed" and asleep in her bassinet.

The same day, DCPP staff discussed the case at an internal conference. Notes from that conference indicated S.T. had two prior terminations of parental rights, drug "charges[,] and . . . [J.G.] ha[d] weapon[ ] and homicide charges." The notes also indicated, however, the "[c]hild is safe."

Thereafter, Rivas completed an updated assessment and noted the only active concerns were S.T.'s—and, by extension, A.G.'s—methadone use, which was being ameliorated by S.T.'s continued successful treatment at Spectrum, but that S.T.'s prior history with DCPP "should be noted." He recommended A.G.'s safety plan going forward involve S.T.'s continued treatment at Spectrum, compliance with any DCPP-recommended services, and continued supervision by DCPP.

The same day, Rivas sent a letter advising S.T. the case was being transferred from the Investigative Forensic Unit to the "Newark Northeast Local

6

Office Permanency unit for ongoing supervision and services," and she would be contacted by her new caseworker within one week. In anticipation of receiving the case, Carson, the succeeding case worker, prepared a "Family Summary/Case Plan/Court Report" documenting the investigation up to that point.

On November 10, 2011, S.T. took A.G. to the hospital because she was displaying gastrointestinal symptoms and severe chaffing, which doctors determined were due to methadone withdrawal.[5] The next day, S.T. informed DCPP of the situation and advised the hospital of DCPP's ongoing investigation. Hospital staff and DCPP spoke the same day, verified S.T.'s report, discussed A.G.'s treatment plan, and confirmed that hospital staff had "no concerns" about S.T. or J.G., who had never appeared to be "under the influence" and were "appropriate" with A.G.

On November 17, 2011, DCPP moved for formal care and supervision of A.G. based on concerns about, among other things, S.T.'s prior DCPP contacts and substance abuse, and J.G.'s criminal record, substance abuse, and mental fitness. The court heard the motion the following day; DCPP, S.T., and A.G. were each represented, while J.G. appeared pro se. At the hearing, S.T. and J.G.

---

[5] A.G. was admitted to the hospital for ten days.

A-0112-23

agreed to comply with all DCPP service recommendations. In an order issued the same day, the court awarded care and supervision to DCPP, but allowed S.T. and J.G. to retain physical and legal custody.

Several days later, Carson, under the supervision of Brown and Khoury, formally took over A.G.'s case. In early December 2011, Carson met with the family at their home and discussed topics similar to those covered by Rivas, including the family's financial situation and social support system, past DCPP involvement, substance use, prior incarceration and probation, and current attitude, enrollment in treatment, and participation in supportive programing. Carson noted A.G. seemed safe and properly provided for.

Carson then requested approval for a parent aide to be assigned to the family for twice-weekly two-hour visits. During visits on January 3 and February 8, 2012, the family confirmed the aide was coming twice a week. A series of reports submitted by the aide in January, February, and March 2012 noted A.G.'s parents were caring for her well. Based on the available record, however, it is unclear whether the aide made the required visits between January 19, 2012, and March 12, 2012.

On December 13, 2011, the court held another hearing and continued to assign DCPP care and supervision of A.G., but physical and legal custody to

8

S.T. and J.G. The court also ordered that each parent submit to such psychological and substance use evaluations as ordered by DCPP.

A week later, Carson referred J.G. to a CADC for a psychological evaluation. J.G. met with Paul Blanos of Catholic Charities for the CADC evaluation approximately three weeks later. He told the clinician he had tried alcohol and marijuana at age fifteen but had not continued use; he tested negative for each. As of March 19, 2012, Blanos had not yet completed the evaluation, but advised DCPP there was "no indication of a substance abuse issue at this time."

On February 18, 2012, J.G. was evaluated by psychologist Dr. Albert R. Griffith, Ed.D. Carson later received the results, which included recommendations for services including parenting classes and vocational services. According to Carson's notes, she interpreted the report to recommend an anger management program. While the report noted J.G.'s "apparent" anger, it did not include anger management among the list of recommendations, concluding J.G.'s anger was "not directed at women," and he was "unlikely to be abusive." According to S.T.'s later statement, however, there had been

9

incidents of J.G. perpetrating domestic violence against A.G., S.T., and his mother.[6]

Carson's next visit was on January 3, 2012, during which the family discussed continued compliance with services and A.G.'s medical appointments. Carson again observed that A.G. seemed safe and provided for, and designated the case a "moderate" risk. Later that month, Carson and Khoury met to discuss the case, concluding that A.G. was "at low risk in the care of" S.T., but asserting that J.G. was "not involved." In early February 2012, Grant became Carson's direct supervisor, replacing Brown.

On February 8, 2012, Carson visited the family again. She learned S.T. had formally graduated from her methadone program but planned to continue all treatment and programming. Spectrum confirmed S.T.'s continued good progress later that month. Carson again concluded A.G. was safe and provided for. Approximately two weeks later, Carson composed a court report, opining A.G. did "not appear to be currently at risk" with her parents and recommending the continued course of supervision and services.

---

[6] Police records show one call made during S.T.'s pregnancy and three between December 2011 and January 2012, all of which resolved without arrest or charges. The parties dispute how and when DCPP was made aware of these incidents.

On February 25, 2012, S.T. called for emergency medical services because A.G. was bleeding from the mouth. A.G. was taken to Clara Maass Medical Center's Emergency Department where S.T. reported she found A.G. bleeding while chewing on a broken pacifier. The triage nurse, however, noted "no bleeding or deep lacerations," and A.G. was discharged less than an hour after she arrived. Staff recorded there were no signs of abuse, violence, or neglect, and did not report the event to DCPP.

Carson next visited the family on March 5, 2012, at which time they discussed continued participation in existing programing and enrollment in additional services. According to a letter Carson drafted, the couple were scheduled for parenting class intake later that day. S.T. and J.G. did not mention the February 25 hospital visit. Carson again noted that it appeared A.G. was safe and her needs were met.

On March 12, 2012, DCPP received a report that A.G.'s parents had taken her to Newark Community Health Center and would be referred to the hospital. The reporter stated A.G. had visible bruising and, according to S.T., had not stopped crying for two hours. A.G. was admitted to the hospital in critical condition before being transferred to the pediatric intensive care unit. Doctors told DCPP A.G. displayed injuries including bleeding in the brain, multiple

11

fractures, and injuries to the liver; she was also experiencing seizures and a fever. A.G. was released from the hospital into S.T.'s care, with the assistance of an in-home nurse, in July 2012.

A subsequent investigation suggested J.G., who had been alone watching A.G. while S.T. was at Spectrum, assaulted A.G. On March 14, 2012, J.G. was charged with second-degree aggravated assault and endangering the welfare of a child. He was later sentenced to seven years in prison.[7] On March 14, DCPP was awarded legal and physical custody of A.G. along with S.T., but not J.G., who was barred from any contact with A.G.

According to plaintiff, A.G. has been hospitalized several times since she sustained her injuries. Between November 2014 and May 2019, A.G. was enrolled—with some gaps—at the Lake View School, where she received psychiatric, speech, occupational, and other care through the New Jersey Institute for Disabilities.[8]

According to a report authored by plaintiff's medical expert, Dr. Daniel Adler, M.D., as of 2019, A.G. continued to suffer from traumatic brain injury,

---

[7] Apart from the seven-year sentence, the motion record does not contain any details regarding the resolution of the charges.

[8] Documents are only current through May 2019; A.G.'s present program of care is not reflected in the motion record.

limited neurological function, spastic quadriparesis, partial blindness, breathing problems, and seizures, all of which are permanent. A.G. also had little to no motor or language development, used a wheelchair, and ate mostly through a gastrostomy tube. Dr. Adler ascribed these injuries to the March 2012 assault and opined A.G. would never be able to receive conventional education, employment, or live independently, and she would require extensive, lifelong medical and supervisory care.

Plaintiff commenced this lawsuit in February 2015. The court appointed Javerbaum as guardian ad litem for the purposes of this litigation on May 8, 2015. On September 7, 2018, plaintiff filed his third amended complaint, the operative document for the purpose of this appeal. That amended complaint alleged one count each of negligence and negligent supervision against the DCPP defendants for failure to prevent J.G. from injuring A.G. on March 12, 2012. The complaint also alleged medical malpractice and vicarious liability against Clara Maass Medical Center, Emergency Medical Associates, Michael Eagan, M.D., Alexsey Ikhelson, P.A.-C, Megan Mazzeo, R.N., and Jamie Nigro, R.N. (medical defendants) for failing to identify and report child abuse following A.G.'s February 25, 2012, emergency room visit.

A-0112-23

On August 18, 2022, the DCPP defendants moved for summary judgment on assorted immunity grounds. The court heard argument, and on April 24, 2023, granted summary judgment on the basis of non-enforcement immunity, dismissed the counts against the DCPP defendants with prejudice, issued a conforming order that same day, and explained its reasoning in a sealed written decision.

In finding failure-to-enforce immunity applied and summary judgment was appropriate, the court began by recognizing that, under the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 to 12-3 (TCA), "immunity is the rule, and liability the exception," notwithstanding that "absolute immunity," including failure-to-enforce immunity, "tends to undermine the goal of providing redress to injured parties through tort law." (Quoting Bombace v. City of Newark, 125 N.J. 361, 372-73 (1991)). Beginning with the statutory text, the court noted N.J.S.A. 59:2-4 and 59:3-5 provide a public entity and employee respectively cannot be liable for failure "to enforce any law." The court cautioned the immunity was not confined to instances of "non-action or the failure to act." (Quoting id. at 367-68). Rather, the immunity applied if "the critical causative conduct by government employees consists of non-action or the failure to act with respect to the enforcement of the law." (Quoting id. at 373).

The court concluded "the critical causative conduct was the failure to act with respect to initiating a removal or termination proceeding." Relying again on Bombace, 125 N.J. at 370, as well as Lee v. Brown, 232 N.J. 114, 128 (2018), the court explained it was of no moment defendants engaged in "antecedent or surrounding conduct" that might not be entitled to absolute failure-to-enforce immunity and instead relegated to "qualified immunity." Since "the critical causative conduct is a failure to enforce the law," the court concluded the DCPP defendants were "entitled to absolute immunity" and summary judgment, and it accordingly dismissed plaintiff's complaint in its entirety with prejudice.

Because it granted summary judgment based on failure-to-enforce immunity, the court expressly declined to address either good faith enforcement immunity or discretionary immunity. Additionally, despite acknowledging plaintiff's argument defendants were not entitled to any immunity under the TCA because they committed willful misconduct, the court did not address or analyze this argument. Finally, despite dismissing the entirety of plaintiff's complaint as to the DCPP defendants, and analyzing the failure-to-enforce immunity exclusively within the context of plaintiff's first negligence-based claim, the court did not specifically address whether defendants were entitled to summary judgment with respect to plaintiff's negligent supervision claim.

A-0112-23

On May 30, 2023, plaintiff moved for leave to appeal the grant of summary judgment, which we denied. On September 11, 2023, the court approved a settlement between plaintiff and the medical defendants.

II.

We review the disposition of a summary judgment motion de novo, applying the same standard used by the motion judge. Townsend v. Pierre, 221 N.J. 36, 59 (2015). Like the motion judge, we view "the competent evidential materials presented . . . in the light most favorable to the non-moving party, [and determine whether they] are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Town of Kearny v. Brandt, 214 N.J. 76, 91 (2013) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)); see also R. 4:46-2(c).

If "the evidence 'is so one-sided that one party must prevail as a matter of law,'" courts will "not hesitate to grant summary judgment." Brill, 142 N.J. at 540 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)). When the moving party has carried its burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

16

Alfano v. Schaud, 429 N.J. Super. 469, 474-75 (App. Div. 2013) (omission in original) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

III.

Before us, plaintiff first argues the court's decision to grant summary judgment on the basis of failure-to-enforce immunity, N.J.S.A. 59:2-4 and 59:3-5, turned on a misinterpretation both of the complaint and the relevant law. He contends the court erred in construing the claims as based entirely on DCPP's failure to remove A.G. from her parent's home, rather than the assortment of alleged shortcomings in the agency's ongoing investigation and handling of the case—the latter of which, he contends, does not amount to "non-enforcement." Additionally, plaintiff argues since not all DCPP defendants were empowered to enforce the removal statute, those that were not so empowered would not be entitled to the immunity.

With respect to the court's conclusion concerning the DCPP defendants' entitlement to failure-to-enforce immunity, plaintiff contends it should not apply to his negligence claims for several reasons. First, he maintains that his claim arose from a poorly performed act, the investigation and supervision of A.G.'s family, not an omission, such as failing to convene removal proceedings.

Next, relying on Estate of Gonzalez v. City of Jersey City, 247 N.J. 551, 579 (2021), plaintiff argues failure-to-enforce immunity could apply only if "a particular defendant made a conscious determination . . . that [they] owed a duty in [their] official capacity to remove A.G.," a requirement defendants did not meet. Relatedly, citing Maison v. New Jersey Transit Corp., 245 N.J. 270 (2021), plaintiff contends the finding of immunity was improvident since "'failure[-]to[-]enforce' immunity cannot be expanded to swallow up claims arising from independent common law duties." Plaintiff further contends there were factual disputes accompanying each of these issues.[9]

In the alternative, even if failure-to-enforce immunity could apply to the facts of this case, plaintiff argues the court erred in finding that it applied to the particular defendants. First, he argues there is a "split" amongst New Jersey courts over whether DCPP defendants are ever candidates for this immunity. Next, quoting Maison, 245 N.J. at 301-04, plaintiff argues failure-to-enforce

---

[9] Plaintiff advances an additional argument, contending the trial court invented an "extra-textual immunity" absolving DCPP of liability when parents harm their children. While plaintiff is correct that such a holding would violate Maison, 245 N.J. at 306, the trial court never adopted such a rule. The portion of the opinion plaintiff cites is the court's summary of defendants' argument: "The State [d]efendants cite to authority that they contend shows that the courts have consistently held that state workers are immune when they have not intervened to prevent children from being harmed by the intentional acts of their parents."

A-0112-23

immunity can only apply to those individuals whose official power is equivalent to a "police officer's powers to make an arrest or a code enforcement official's authority to enforce a municipal building code violation in municipal court." In plaintiff's view, each defendant must themself be a "public official charged with enforcing" an identifiable law in order to benefit from this immunity.

As noted, plaintiff's complaint against the DCPP defendants comprised two claims. The negligence claim was based on such alleged "wrongful actions and/or omissions" as:

> [F]ailing to provide the in-home child care and parent aide services; failing to treat this as a high[-]risk case; failing to refer [A.G.] and the case to the Regional Diagnostic and Treatment Center; failing to ensure that [A.G.] was not left alone with [J.G.]; failing to remove [J.G.] from the home; and/or failing to remove [A.G.] from the home; and otherwise failing to act to protect [A.G.] from foreseeable risks of harm, including imminent risks of harm.

In support of this claim, plaintiff highlighted several DCPP "policies, protocols and standards of care," along with duties imposed by the court's care and supervision orders. Relying on proffered expert in the field of child protection and welfare services, Phil Goldstein, plaintiff asserted defendants violated those policies in several ways during the investigation, documentation, provision of services, and decision-making phases of the case. The negligent

19

supervision claim, conversely, was based on an unspecified breach of the duty to "properly hire, train, screen, retain, and supervise" staff such that they executed their responsibilities "as required by law, [DCPP's] policies and procedure, and the [c]ourt's orders."  As explained supra, the court focused solely on the first count in plaintiff's amended complaint; we therefore do the same for the purpose of this immunity issue.

In 1970, our Supreme Court abrogated the doctrine of sovereign immunity, which, along with related separation of powers concerns, had long prevented governmental actors from being sued in the courts of our state.  Willis v. Dep't of Conservation & Econ. Dev., 55 N.J. 534, 537-41 (1970).  In 1972, the Legislature replaced the doctrine with the TCA, which recognized both "the inherently unfair and inequitable results which occur in the strict application of the traditional doctrine of sovereign immunity" and that, because "the area within which government has the power to act for the public good is almost without limit," the "government should not have the duty to do everything that might be done."  N.J.S.A. 59:1-2.

Nonetheless, the intention of the TCA was "to reestablish a system in which immunity is the rule, and liability the exception," for public entities.  Gonzalez, 247 N.J. at 570 (quoting Bombace, 125 N.J. at 372).  The TCA

20

therefore pronounced that "[e]xcept as otherwise provided by this act, a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person," and that any liability permitted by the TCA was still "subject to any immunity of the public entity." N.J.S.A. 59:2-1. Put another way, "a public entity is immune from liability for injury unless there is a specific exception included in the [TCA] itself which provides for liability." Fielder v. Stonack, 141 N.J. 101, 117 (1995). And, even "[w]hen liability is established under the Act, [the public entity] is still subject to immunity specified in the Act as well as any common-law immunity which predated the Act." Ibid.

For public employees, conversely, immunity "is the exception rather than the rule." Id. at 118. The TCA established, "[e]xcept as otherwise provided by this act, a public employee is liable for injury caused by [their] act or omission to the same extent as a private person . . . subject to any immunity of a public employee provided by law." N.J.S.A. 59:3-1(a) and (b). For entity and employee alike, where the TCA seems to both impose liability and grant immunity, "the latter trumps the former." Gonzalez, 247 N.J. at 570 (quoting Tice v. Cramer, 133 N.J. 347, 356 (1993)).

21

Entity and employee immunity are largely reciprocal. A "public employee is not liable for an injury where a public entity is immune from liability for that injury." N.J.S.A. 59:3-1(c). While a public entity is vicariously liable for "injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual," the "entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable." N.J.S.A. 59:2-2(a) and (b). This reciprocity harmonizes with the State's obligation to defend and indemnify employees sued for acts within the scope of their employment. N.J.S.A. 59:10-1; N.J.S.A. 59:10A-1. When a party asserts an immunity under the TCA, that party has the burden "both to plead and prove its immunity." Kolitch v. Lindedahl, 100 N.J. 485, 497 (1985).

Both public entities and public employees enjoy absolute immunity from suit flowing from their failure to enforce the law. N.J.S.A. 59:2-4 ("A public entity is not liable for any injury caused by adopting or failing to adopt a law or by failing to enforce any law."); N.J.S.A. 59:3-5 ("A public employee is not liable for an injury caused by his adoption of or failure to adopt any law or by his failure to enforce any law."). This unqualified immunity is in contrast to the qualified immunity granted to public employees enforcing the law. See N.J.S.A.

22

59:3-3. "[T]he critical distinction between the qualified, good-faith immunity of section 3-3 and the absolute immunity of section 3-5 is action as opposed to nonaction with respect to the enforcement of the law." Bombace, 125 N.J. at 368. Qualified good faith enforcement immunity "applies 'only when an act has taken place with knowledge of the facts and the law,'" whereas failure-to-enforce immunity "applies when there is no 'act.'" Ibid. (quoting Marley v. Borough of Palmyra, 193 N.J. Super. 271, 293 (Law Div. 1983)).

Therefore, "application of the absolute [failure-to-enforce] immunity under the Act is determined by whether the critical causative conduct by government employees consists of non-action or the failure to act with respect to the enforcement of the law." Id. at 373. As our Supreme Court has recognized:

> There is, in addition, reasonable support grounded in public policy for the legislative distinction between acts and failure to act, between action and non-action, as the basis for governmental immunity. The objective of the absolute immunity of section 3-5, and its counterpart, section 2-4, is to protect government from liability for its failure to enforce a law. Such a failure would most often, if not invariably, occur when a person's harm arises out of a code violation or a breach of law that would be directly attributable to someone else's wrongful acts; the government's failure to act or non-action would be only an indirect contributing cause of the harm. In that context, the victim would at least have a principal wrongdoer from whom to seek redress.

23

[Id. at 371-72 (citations omitted).]

Crucially, "if conduct giving rise to injury consists only of non-action or the failure to act in the enforcement of the law, it is entitled to absolute immunity, even though other antecedent or surrounding conduct might constitute acts or action that would otherwise be subject to the qualified immunity." Lee, 232 N.J. at 128 (quoting Bombace, 125 N.J. at 370). Put another way, if a chain of events terminates with inaction that is the "critical causative conduct" behind plaintiff's injury, it is irrelevant that affirmative enforcement acts occurred earlier in that chain. Ibid.

Having reviewed the motion record and applicable law, and applying our de novo standard of review, we affirm the court's order only insofar as it concluded the DCPP defendants are entitled to the failure-to-enforce immunity with respect to the first count in plaintiff's amended complaint. We are unpersuaded by plaintiff's contention failure-to-enforce immunity is not applicable here because his claim, and thus the "critical causative conduct," is not the failure to remove A.G. from her parents. Plaintiff contends that if the "DCPP [d]efendants had not been reckless and dilatory in their investigation and supervision of this case (in violation of DCPP standard operating procedures), they would have detected much earlier that [J.G.] was mentally ill, dangerous,

could never be left alone with A.G., yet had regular access to her." As a corollary, he argues there are factual questions about whether, if DCPP performed a more complete investigation, it would have "issued a safety plan that would have precluded [J.G.] from" being alone with A.G., or otherwise conducted its supervision in a way that prevented A.G.'s injuries.

While plaintiff contends that a poor investigation, not non-removal, is the "critical causative conduct" behind A.G.'s injuries, we are unpersuaded by the proffered distinctions in light of Lee. Stated differently, in our view, a poor investigation is harmful only if it leads to poor outcomes. For example, if DCPP performed a shoddy investigation yet still removed A.G. from J.G.'s care, the harm at issue would never have occurred. This continuity between investigation and outcome is recognized in a number of cases where our courts awarded failure-to-enforce immunity despite errors occurring in the investigative phase.

Most importantly, in Lee, 232 N.J. at 120-21, an electrical inspector found dangerous wiring in a residential building but failed to follow department policy requiring him to notify his direct supervisor, reporting to other superiors instead. As a result, authorities failed to order a power shut-off, resulting in a fire that killed four and injured several others. Id. at 121. The court held, despite the ongoing investigation by the inspector, the failure to "secure an emergency

power shut-off" was the "critical causative conduct." Id. at 129. Because that omission, not any of the intermediate enforcement steps, had caused plaintiff's injuries, defendants were entitled to failure-to-enforce immunity. Ibid.

In Reaves v. State, Department of Law & Public Safety, Division on Civil Rights, 303 N.J. Super. 115, 117 (App. Div. 1997), the plaintiff filed a complaint for workplace discrimination. The Division on Civil Rights began an investigation but allowed it to languish for eight years. Ibid. The Office of Administrative Law dismissed the complaint as a result of the delay. Ibid. Even in that rare case where a poorly managed investigation was itself harmful, the court awarded failure-to-enforce immunity since the Division on Civil Rights was tasked, by law, with performing the investigation in a timely manner. Id. at 119-20.

Thus, even if there were errors at the investigative or supervisory stage, the central question remains whether the "critical causative conduct" constituted non-enforcement. Bombace, 125 N.J. at 373. Plaintiff does not appear to dispute the trial court's holding that if non-removal were the critical causative conduct, failure-to-enforce immunity would be appropriate. He argues instead, if the quality of the investigation had been better, DCPP might have known of

the risk J.G. posed and pursued any number of options to keep A.G. from being in his care.

Plaintiff does not identify any of these options in his brief, and his citations to the record include only three speculative options: increased use of a parental aide; removal of J.G. from the home; or removal of A.G. The shortcomings plaintiff identifies in DCPP's investigation are only relevant, however, if they culminate in the failure to engage in a law enforcement action.

Moreover, plaintiff framed defendants' putative duties and breaches wholly in terms of DCPP law and policy. Most broadly, N.J.S.A 30:4C-1.1 provides that "allegations of child abuse and neglect must be investigated quickly and thoroughly[,] and protective actions must be taken immediately if necessary." DCPP staff "shall" complete safety and risk assessments using DCPP-promulgated tools and procedures, N.J.A.C. 3A:10-3.2(b) and (c), "shall" compose an appropriate safety plan, N.J.A.C. 3A:10-3.2(d), and "shall" remove the child if safety cannot be otherwise assured, N.J.A.C. 3A:10-6.2. Other procedures flow therefrom. Therefore, as in <u>Reaves</u>, 303 N.J. Super. at 119, the method of conducting the investigation is contained within the text of the law. Thus, conducting the investigation in accordance—or not—with the law constitutes enforcement—or not—of the law. <u>Ibid.</u>

Plaintiff resists the notion his claim flows entirely from statutory duties, attempting to situate this case among those in which a state actor was found to be subject to other duties and liabilities; and thus not entitled to the failure-to-enforce immunity. For example, in Maison, 245 N.J. at 301-04, our Supreme Court found a NJ Transit bus driver was subject to common-carrier liability. We held in Saldana v. DiMedio, 275 N.J. Super. 488, 491-92, 499 (App. Div. 1994), that where the city was both the owner of code-violating vacant properties and the authority that neglected to enforce the code, it could be held responsible in the former role, even if not the latter. L.E. v. Plainfield Public School District, 456 N.J. Super. 336, 346-47 (App. Div. 2018), and Gonzalez v. New Jersey Department of Children & Families, 545 F. Supp. 3d 178, 217-18 (D.N.J. 2021), aff'd in part on other grounds, Nos. 21-2395 and 21-2439, 2023 U.S. App. LEXIS 14237 (3d Cir. June 8, 2023), held that when a public agency—a school and the foster care system, respectively—legally compels a child to enter its care, that agency is subject to a common law duty to protect the child.

In this case, however, plaintiff does not identify any common law duty that animates the claim in count one. As discussed above, the particulars of plaintiff's complaint, expert report, and statement of material facts involve departures from DCPP policy—not a common law standard of care. His merits

brief likewise does not argue for the existence of any specific common law duty to which the DCPP defendants were subject in this case. L.E., 456 N.J. Super. at 347-48, confines its discussion to schools. Gonzalez, 545 F. Supp. 3d. at 217-18, does not purport to identify a general duty that applies to DCPP and its employees in all cases. It theorizes only that the New Jersey Supreme Court would recognize a narrow duty for foster care authorities, premised on the recognition that a child entering foster care is "'compelled by law' to enter the state's custody," in lieu of their parents'. Id. at 217. Because neither is analogous to the facts of this case, no applicable common law duty can be inferred.

We also reject plaintiff's argument that, even if the failure-to-enforce immunity could apply to the facts of this case, the court erred in finding that it applied to the particular defendants. Regarding DCPP generally, plaintiff cites a single unpublished Law Division case, alongside Gonzalez, 545 F. Supp. 3d. 178, as evidence of "a string of . . . disparate outcomes as to how [failure-to-enforce] immunity applies to DCPP misconduct." Neither that unpublished decision nor Gonzalez are binding on this court. S & R Assocs. v. Lynn Realty Corp., 338 N.J. Super. 350, 354-56 (App. Div. 2001).

Moreover, Gonzalez, 545 F. Supp. 3d at 217, stands only for the notion that DCPP may not be immune from liability in the compulsory foster placement

context, not that it may never benefit from failure-to-enforce immunity. The unpublished decision likewise makes no such categorical rule; to the extent it held acts like answering a phone call, engaging the caller in conversation, and conferring with a supervisor preclude failure-to-enforce immunity, it is squarely contrary to Lee, 232 N.J. at 120-21, 129 (where an employee who investigated and reported to the wrong superior was given failure-to-enforce immunity), and Reaves, 202 N.J. Super. at 117, 119-20 (where a department investigated too slowly, to plaintiff's determinant, was afforded the same immunity).[10]

As to the individual defendants' eligibility for failure-to-enforce immunity, plaintiff argues neither Carson, Khoury, nor Grant[11] established they had the ability to "enforce" Title 30 by triggering a removal action. Plaintiff contends removal "is the role and duty of different DCPP employees and other government agencies," and that "[m]erely being employed by a public agency that also employs others to enforce a particular statute is not a sufficient nexus to trigger absolute immunity."

---

[10] Defendants also provide their own unpublished case in which DCPP defendants were granted failure-to-enforce immunity. While this case exerts no more legal compulsion than those provided by plaintiff, the cases, taken together, demonstrate this immunity is afforded to DCPP in some cases and not in others, as is appropriate.

[11] This argument would presumably apply with equal force to Rivas.

Plaintiff's argument is squarely contrary to the holding in Lee, 232 N.J. at 118. As noted, the primary defendant in Lee was an electrical inspector who discovered unsafe conditions in a multi-family home. Id. at 120. He testified that it was department policy for him to notify his supervisor of any such findings so that the supervisor could "determine whether to shut off the power." Id. at 120-21. His failure to do so resulted in the supervisor failing to shut off the power, which resulted in the fire underlying the action. Id. at 121.

Notwithstanding the supervisor was responsible for the ultimate "enforcement" decision, the inspector was granted failure-to-enforce immunity. Id. at 128-29. By the same token, even if certain defendants in this case were not responsible for the ultimate case resolution decisions but only for the putative failure to gather and convey information, failure-to-enforce immunity would be available to them by the terms of Lee, 232 N.J. at 129.

In a similar argument, plaintiff contends Gonzalez, 247 N.J. at 559, and Maison, 245 N.J. at 274-75, read together, establish a new barrier to immunity for public defendants. He contends these cases require the court to address "(1) whether a particular defendant testified [they were] duly authorized to enforce" the relevant statute, and "(2) whether a particular defendant made a conscious determination based on the factual circumstances that [they] owed a duty in

[their] official capacity to" do so, before immunity is granted. We are unpersuaded.

In Gonzalez, 247 N.J. at 559, police responded to a one-vehicle accident on a highway bridge. The vehicle was towed, but the motorist rejected officers' offers to drive him off the bridge, insisting he had called for someone to pick him up. Ibid. Unbeknownst to the officers, the motorist was intoxicated and, after they departed, walked into traffic where he was struck and killed by a passing car. Ibid. The motorist's estate sued the officers, the police department, and the city, all of whom claimed immunity under the TCA and N.J.S.A. 26:2B-16, which governs officers' removal of visibly intoxicated individuals from public places. Id. at 564, 568-69.

The Supreme Court held N.J.S.A. 26:2B-16 did not apply because the evidence showed there had been no indication that the motorist was intoxicated: thus, neither the powers, duties, nor immunities of the statute applied. Id. at 569-70. In a brief, one-paragraph analysis, the Court added both failure-to-enforce and good faith enforcement immunity were inapplicable for the same reason: since the motorist was not visibly intoxicated, police had no statutory duty or power to remove him from the roadside, and "there was therefore no applicable law to enforce or fail to enforce." Id. at 579.

Thus, under the unique facts of that case, testimony establishing that officers could perceive defendant's intoxication was crucial. N.J.S.A. 26:2B-16, allowing the officers to remove the motorist, is conditioned on visible intoxication. Without visible intoxication, there was no law that the officers could fail to enforce, and the immunity could not attach. Gonzalez, 247 N.J. at 569-70, 579. Crucially, in that case, plaintiffs could maintain their case absent the breach of a statutory duty since police have a long-established common law duty to respond to motor vehicle accidents and aid those involved. Id. at 572. At no point did the Court suggest the same testimonial and observational preconditions relevant in that case would apply to failure-to-enforce claims generally.

In Maison, 245 N.J. at 274-75, a NJ Transit commuter was harassed and assaulted while the bus driver failed to intervene. Following the events, the commuter filed a complaint alleging the defendants "breached their common-carrier duty to protect her from the wrongful acts of co-passengers," resulting in injury. Id. at 276. After receiving an adverse outcome at trial, defendants argued for the first time that plaintiff's claim, "in disguise," was that the bus driver "had a duty to enforce NJ Transit regulations prohibiting passengers from engaging in tumultuous behavior, throwing objects, or threatening or striking

33

others," and that failure to do so merited immunity. Id. at 284, 302. In support of this argument, the defendants offered "regulations promulgated by NJ Transit, governing 'the standards of behavior to be followed' by passengers," which, they asserted, the driver was responsible to enforce. Id. at 302.

The Court rejected this argument, observing neither testimonial evidence nor the text of the regulations indicated drivers were empowered, much less required, to enforce the regulations. Id. at 303. Indeed, the regulations did not indicate who, if anyone, could do so. Ibid. Thus, the defendants' duties, like their liabilities, flowed from their status as a common carrier, not a public entity tasked with executing a specific law, and the Court refused to allow public entities to "extinguish centuries-long common-carrier duties" by enacting duplicative regulations and electing not to enforce them. Id. at 303-04.

Unlike in either of the above cases, as noted, defendants in this case are governed by specific rules they are tasked with executing. These include statutes and administrative rules structuring investigations generally, N.J.S.A. 9:6-8.8; N.J.S.A. 30:4C-1.1 (requiring that "allegations of child abuse and neglect must be investigated quickly and thoroughly and protective actions must be taken immediately if necessary"), providing for investigation, N.J.A.C. 3A:10-2.1 (mandating investigation upon report of behavior which would

34

constitute abuse and neglect), guiding risk assessments and safety plans, N.J.A.C. 3A:10-3.2 (providing that staff "shall assess the safety," "complete a risk assessment," and develop a safety protection plan), structuring contact with families, N.J.S.A. 30:4C-25; N.J.A.C. 3A:12-2.6 (requiring regular visits with families whose children are under care and supervision), as well as removal, N.J.S.A. 30:4C-15.1(a) (describing the conditions under which the "division shall initiate a petition to terminate parental rights").  Since the parties do not dispute a qualifying complaint was made, it is likewise undisputed the staff were required to investigate in accordance with the law.  Thus, unlike the Gonzalez and Maison defendants, defendants in this case can identify enforceable laws they are alleged not to have followed.

As such, we affirm the April 24, 2023 order to the extent the court concluded the DCPP defendants are entitled to the failure-to-enforce immunity with respect to the first count in plaintiff's amended complaint.  For the reasons that follow, however, we reverse and vacate that portion of the court's order that dismissed plaintiff's entire complaint with prejudice.

IV.

Plaintiff next contends the court erred in failing to address his argument that, even if failure-to-enforce or another immunity would otherwise apply, the

35

facts might reveal willful misconduct sufficient to abrogate such immunity. Plaintiff purports to identify a series of acts and omissions that constituted or contributed to willful misconduct. For example, he asserts "Khoury <u>admitted</u> she did not correctly complete the DCPP's safety and risk assessment protocols," and Carson and Khoury together "recklessly" failed to timely learn about the mental health, cognitive function, drug use, domestic violence, and termination of parental rights histories of A.G.'s parents, as well as fully comprehend J.G.'s role as a caretaker. (Emphasis in original). Moreover, plaintiff underscores Khoury "<u>conceded</u> she had violated numerous DCPP protocols" and "offered <u>no</u> <u>excuse or explanation</u>." (Emphasis in original). He argues Carson and Khoury "knowingly took short cuts" and "prematurely completed" the risk assessment, resulting in "A.G.'s case being misclassified as 'low' or 'moderate' risk" and not given a proper safety plan.

Plaintiff also contends other unspecified DCPP employees committed willful misconduct by failing to ensure the twice-weekly parental aide visits were actually taking place as scheduled. He further argues Carson knew A.G. was being left alone with J.G., and once she received J.G.'s psychological evaluation on February 21, 2012, she was aware he "posed a grave danger to A.G.," yet did nothing. In summary, plaintiff asserts the individual DCPP

defendants admitted both that they did not follow DCPP procedure and that, had they done so, they would have handled the case much differently.

The willful misconduct exception to public employee immunity is set forth at N.J.S.A. 59:3-14(a), which provides public employees are subject to full liability "if it is established that [their] conduct was outside the scope of [their] employment or constituted a crime, actual fraud, actual malice[,] or willful misconduct." Thus, the absolute failure-to-enforce immunity "does not apply with respect to egregious misconduct or conduct beyond the scope of employment." Bombace, 125 N.J. at 373 (citing N.J.S.A. 59:3-14). In such situations, public entities are absolved of responsibility for their employee's conduct, N.J.S.A. 59:2-10, as well as the duty to defend, N.J.S.A. 59:10A-2(b), or indemnify the employee, N.J.S.A. 59:10-2.

The willful misconduct exception is intended to target "a public employee guilty of outrageous conduct." Velez v. City of Jersey City, 180 N.J. 284, 291 (2004) (quoting N.J.S.A. 59:3-14 comment). Thus, one "traditional formulation of willful misconduct has required 'a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences.'" Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 584 (2009) (quoting Berg v. Reaction Motors Div., Thiokol Chem.

37

Corp., 37 N.J. 296, 414 (1962)). In other instances, our Supreme Court has "described it as conduct that falls 'between simple negligence and the intentional infliction of harm.'" Ibid. (quoting Fielder, 141 N.J. at 123). Neither "[c]arelessness, unreasonable conduct or even noncompliance with substantive law" are necessarily sufficient to strip an employee of immunity. Van Engelen v. O'Leary, 323 N.J. Super. 141, 154 (App. Div. 1999). Specifically, in Leang, the Court underscored that the employee must have "some knowledge that the act is wrongful." 198 N.J. at 584 (quoting Fielder, 141 N.J. at 124).

Because a finding the individual DCPP defendants engaged in willful misconduct would subject them to liability notwithstanding their entitlement to failure-to-enforce immunity, we reverse and vacate that portion of the court's order dismissing plaintiff's complaint in its entirety with prejudice and remand for further proceedings. While the court acknowledged the willful misconduct argument below, it did not analyze or rule on it. This was error, since Rule 4:46-2(c) expressly requires the court, on summary judgment, to "find the facts and state its conclusions" of fact and law "in accordance with" Rule 1:7-4, which, in turn, requires the court to set forth such findings by opinion or memorandum decision. Failure to do so inhibits appellate review and "constitutes a disservice to the litigants, the attorneys[,] and the appellate court." Big Smoke LLC v.

Twp. of W. Milford, 478 N.J. Super. 203, 227-28 (App. Div. 2024) (quoting Curtis v. Finneran, 83 N.J. 563, 569-70 (1980)).

We further note in opposition to defendants' motion for summary judgment and statement of material facts, plaintiff proffered substantial evidence on the issue of willful misconduct. By way of example only, plaintiff claims Khoury, Carson's supervisor, "knew the actual risk in A.G.'s case was 'high,' but" permitted the risk level to be documented as "low" or "moderate." Plaintiff claims, in essence, that Khoury was aware that A.G.'s case was misclassified, it was her duty to correct that error, and that the error resulted in a different treatment of A.G.'s case that ultimately led to her injuries. Under plaintiff's theory, Khoury's affirmative endorsement of a risk assessment she knew to be wrong lead to diminished supervision of the family which, in turn, lead to A.G. being inappropriately left alone with J.G. and ultimately injured.

Additionally, plaintiff claims there is support in the record for a finding of willful misconduct by the other DCPP employees involved in A.G.'s case. Noting "the backbone of DCPP's safety plan for A.G. was to have a parent aide in her home twice a week," plaintiff contends both "Grant and Brown admitted the absence of a parental aide left A.G. with no protection for months leading up to the attack." (Emphasis in original). With respect to Carson, plaintiff

argues despite admitting "to knowing (1) [J.G.] was alone with A.G. multiple times per week; and (2) after reviewing Dr. Griffith's psychological evaluation on February 21, 2012, [J.G.] posed a grave danger to A.G.," Carson did nothing for the following eighteen days leading up to J.G.'s assault on A.G.

Nothing in our opinion should be interpreted as an expression of our views on the merits of plaintiff's claim. We simply conclude the court erred in failing to address plaintiff's allegations regarding the DCPP defendants alleged willful misconduct. We therefore reverse and vacate the April 24, 2023 order to the extent it dismissed plaintiff's complaint with prejudice, and remand this question to the court for an appropriate statement of findings consistent with Rule 1:7-4.

V.

Plaintiff also argues—as with the willful misconduct issue—the court erred in dismissing his negligent supervision claim without any analysis or factual findings. Indeed, despite acknowledging plaintiff's negligent supervision claim, the court did not discuss it and analyzed the failure-to-enforce immunity solely in the context of the allegations contained in the first count of plaintiff's amended complaint. Plaintiff contends each count involved disparate factual and legal issues and, as a result, the grant of immunity did not apply equally, and more fulsome analysis was required. Defendants contend it is of

no moment the court did not address this claim independently because plaintiff "has failed to identify any evidence whatsoever—let alone any sufficient to constitute a genuine dispute of material fact—that would support any of the elements of negligent supervision."

A claim of negligent supervision requires that "(1) an employer knew or had reason to know that the failure to supervise or train an employee in a certain way would create a risk of harm and (2) that risk of harm materializes and causes the plaintiff's damages." G.A.-H. v. K.G.G., 238 N.J. 401, 416 (2019). It is part of a group of employer-focused torts, along with negligent hiring and negligent training, that are not forms of "vicarious liability" for an employee's culpable conduct, but rather accord liability "based on the direct fault of an employer." Id. at 415-16; see also Hoag v. Brown, 397 N.J. Super. 34, 54 (App. Div. 2007) (labeling such cases as "'primary liability' tort[s]" (quoting Cosgrove v. Lawrence, 215 N.J. Super. 561, 563 (App. Div. 1987))).

As with willful misconduct, the court did not explain its decision to dismiss this cause of action. Additionally, in their merits submissions, neither party addresses the substance of the claim in great detail. Under these circumstances, we conclude the parties' claims are best addressed on remand.

As noted, the court did not make findings of fact and conclusions of law with respect to plaintiff's negligent supervision claim. "Appellate review . . . 'does not consist of weighing evidence anew and making independent factual findings; rather, our function is to determine whether there is adequate evidence to support the judgment rendered' by the trial court." Allstate Ins. Co. v. Fisher, 408 N.J. Super. 289, 302 (App. Div. 2009) (quoting Cannuscio v. Claridge Hotel & Casino, 319 N.J. Super. 342, 347 (App. Div. 1999)). We decline to exercise original jurisdiction to decide whether summary judgment is appropriate based on the present record. Est. of Doerfler v. Fed. Ins. Co., 454 N.J. Super. 298, 301-02 (App. Div. 2018) ("Although our standard of review from the grant of a motion for summary judgment is de novo . . . our function as an appellate court is to review the decision of the trial court, not to decide the motion tabula rasa."); Price v. Himeji, LLC, 214 N.J. 263, 294 (2013) (noting Rule 2:10-5 "allow[s an] appellate court to exercise original jurisdiction to eliminate unnecessary further litigation, but discourage[s] its use if factfinding is involved") (alterations in original) (quoting State v. Santos, 210 N.J. 129, 142 (2012)).

Nor do we address defendants' argument, presumably referencing N.J.S.A. 59:2-2(b), that "all individual DCPP defendants are immune and, for that reason

42

alone, so is DCPP." See ibid. ("A public entity is not liable . . . where the public employee is not liable."). First, as noted supra, the court analyzed the applicability of the failure-to-enforce immunity solely within the context of plaintiff's first negligence-based claim. It did not address how immunity would apply to the unique facts under plaintiff's negligent supervision claim. We therefore decline to exercise our original jurisdiction to address the issue.

Second, we note a claim of negligent supervision does not hold an employer derivatively liable for its employees' wrongs; it holds an employer directly liable for its own wrongs that cause injury through its employee. Hoag, 397 N.J. Super. at 54; see also N.J.S.A. 59:2-2(a) (providing that a public employer will be liable for an "injury proximately caused by" its employee "in the same manner and to the same extent as a private individual under like circumstances"). Indeed, we have recognized the fact that N.J.S.A. 59:2-10 immunizes public employers from liability "for the acts or omissions" of its employees when those acts or omissions constitute "crime, actual fraud, actual malice, or willful misconduct" "does not prevent allocation of fault to a public entity where that entity is liable for the negligent supervision of an employee who has engaged in willful misconduct," see Hoag, 397 N.J. Super. at 54

(quoting Harry A. Margolis & Robert Novack, Claims Against Public Entities, cmt. on N.J.S.A. 59:2-10 (Gann 2007)).

We therefore reverse that portion of the court's April 24, 2023 order that granted summary judgment to defendants and dismissed plaintiff's negligent supervision claim with prejudice, and remand for further proceedings.

VI.

In addition to the failure-to-enforce immunity discussed supra, plaintiff urges that neither discretionary, N.J.S.A. 59:2-3 and 3-2, nor good faith enforcement immunity, N.J.S.A. 59:3-3, applies to either of his claims. Because the court granted summary judgment based on failure-to-enforce immunity, it expressly declined to address either qualified immunity.

Because we have concluded failure-to-enforce immunity applies to the first negligence count in plaintiff's complaint, subject to any finding of willful misconduct, we need not address these alternative immunities for the purpose of that claim. Further, we need not decide whether these immunities and the absolute failure-to-enforce immunity apply to plaintiff's negligent supervision

44

claim because, on remand, defendants retain the right to argue that these immunities apply to that claim.[12]

In sum, we affirm the grant of failure-to-enforce immunity with respect to the first count of plaintiff's amended complaint. We reverse, however, the court's dismissal of plaintiff's complaint with prejudice, and remand for further proceedings as to plaintiff's allegations the individual defendants engaged in willful misconduct and thus are liable notwithstanding any immunity conferred upon them by the TCA. To the extent on remand any party files a dispositive motion concerning plaintiff's negligent supervision claim, or any other remaining claim, the court shall make appropriate findings of fact and conclusions of law on all issues. See R. 1:7-4(a).

Affirmed in part, reversed and vacated in part, and remanded for further proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanly

Clerk of the Appellate Division

---

[12] We further note, aside from cursory arguments advanced in their merits brief, defendants have not sufficiently explained, either before the trial court or on appeal, how any specific immunity would apply to plaintiff's negligent supervision claim. Since negligence and negligent supervision are structurally different causes of action, the application of immunity logically requires a separate analysis. Yet, as the party claiming TCA immunity, it is DCPP's burden "both to plead and prove." Kolitch, 100 N.J. at 497. Since defendants have made no attempt to meet that burden with respect to negligent supervision, we do not do so in their stead.

A-0112-23